Donald J. ROBERTSON,
Plaintiff-Appellant,

v.

SEIDMAN & SEIDMAN,
Defendant-Appellee.

No. 193, Docket 78–7278.

United States Court of Appeals,
Second Circuit.

Argued Nov. 1, 1978.

Decided Aug. 29, 1979.

---

Donald I. Laventhall, New York City (La-venthall & Zicklin, New York City, on the brief), for plaintiff-appellant.

Mathias E. Mone, New York City (Loret-ta A. Preska, and Cahill Gordon & Reindel, New York City, on the brief), for defend-ant-appellee.

Before MOORE, FEINBERG and TIM-BERS, Circuit Judges.

TIMBERS, Circuit Judge:

This is another in a series of cases which are occupying with increasing frequency the attention of the federal courts. They involve the responsibility of certified public

accountants in preparing and certifying financial documents required by the Securities and Exchange Commission. The instant case arises in the context of an accounting firm's reliance on the statute of limitations in an action brought against the firm by a shareholder to recover damages under Section 10(b) and Rule 10b–5 alleged to have resulted from false and misleading statements in the financial documents prepared and certified by the accountants.

On this appeal from an order entered in the Southern District of New York, Dudley B. Bonsal, *District Judge*, granting summary judgment in favor of defendant and dismissing plaintiff's federal securities laws claims and pendent state law claims, the essential question is whether summary judgment was properly granted on the ground that the claims alleged in the complaint were time-barred. For the reasons below, we hold that genuine issues of material fact were presented and that summary judgment was improper. Accordingly, we reverse and remand the case to the district court for jury trial, under proper instructions from the court, on all issues of fact, including whether, if plaintiff had exercised due diligence, he should have discovered the alleged fraud on the part of the accounting firm more than two years before commencement of this action; and whether there was sufficient concealment on the part of the accounting firm to invoke the federal equitable tolling doctrine.

## I.

### FACTS AND PRIOR PROCEEDINGS

Appellant Donald J. Robertson (hereinafter "appellant" or "plaintiff") was a shareholder of SaCom, a California corporation which is now defunct. It specialized in the development and manufacture of electronic communications equipment. On July 6, 1977, appellant commenced the instant class action in the Southern District of New York on behalf of himself and all others similarly situated who had purchased common shares of SaCom during the period from October 31, 1972 to June 25, 1974. The complaint named as defendant an independent firm of certified public accountants, Seidman & Seidman (hereinafter "appellee" or "defendant"), which had audited the books and records of SaCom and had prepared and certified the accuracy of certain SaCom financial documents contained in its October 1972 offering prospectus and registration statements, as well as in its annual report (Form 10–K) for the fiscal year ending September 30, 1972.

The complaint alleged that the financial documents prepared and certified by Seidman & Seidman contained false and misleading statements in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1976), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1978). The complaint further alleged that defendant aided and abetted fraudulent activities of SaCom's management and conspired with management to violate the securities laws. Plaintiff demanded a jury trial.

Defendant filed an answer which admitted that it had audited the books and records of SaCom and had issued a report on the financial documents in question. It denied all wrongdoing alleged in the complaint. On October 5, 1977, defendant filed a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) on the ground that the claims alleged in the complaint were barred by the applicable statute of limitations. The district court treated the motion as one for summary judgment pursuant to Fed.R.Civ.P. 56, since matters outside the pleadings were presented to and not excluded by the court. Fed.R.Civ.P. 12(c).

On May 3, 1978, Judge Bonsal filed a well reasoned opinion granting defendant's motion for summary judgment and dismissing the complaint.[1] He first determined that

---

1. In view of this disposition of defendant's motion, the district court found it unnecessary to reach plaintiff's motion pursuant to Fed.R. Civ.P. 23(c)(1) for an order certifying the action as a class action. Since no issue is before us on the instant appeal with respect to the propriety of maintaining the instant action as a class action, we express no views thereon.

the applicable statute of limitations was Alaska's two year limitations period for "any injury to the person or rights of another not arising on contract." Alaska Stat. § 09.10.070. He then held that, since plaintiff had knowledge of certain information which should have alerted him to defendant's fraudulent activities had he exercised "reasonable diligence", *Arneil v. Ramsey,* 550 F.2d 774, 781 (2 Cir. 1977), plaintiff should be charged with knowledge of the fraud "before July 6, 1975—more than two years before he commenced this action." The factors relied upon by Judge Bonsal in granting summary judgment and dismissing the complaint were: (1) plaintiff's asserted suspicion of fraud based on the precipitous decline in the value of his SaCom shares; (2) plaintiff's participation as an intervenor in an action commenced in the Southern District of New York on April 8, 1975 which arose out of the October 1972 public offering of SaCom shares and which named as defendants certain underwriters and marketmakers who were charged with market manipulation and other securities laws violations;[2] and (3) certain public information relating to Seidman & Seidman's role in the 1972 underwriting.

From the judgment entered on Judge Bonsal's opinion, the instant appeal has been taken. Plaintiff contends that the factors relied upon by the district court raised genuine issues of material fact on which he was entitled to a trial.

With the foregoing brief summary of the facts[3] and prior proceedings in mind, we shall consider in the remainder of this opinion the applicable statute of limitations and when it begins to run; the relevant factors in determining when appellant should have discovered the alleged fraud; the standard for granting summary judgment in this type of case; and the applicability of the equitable tolling doctrine.

## II.

## STATUTE OF LIMITATIONS

█ In enacting § 10(b) of the Exchange Act, Congress did not specify any particular statute of limitations or period in which an action must be commenced. Accordingly, we have held, in determining whether a suit is timely brought, that courts should refer to the statute of limitations of the forum state, including any "borrowing statute" of the forum. *Arneil v. Ramsey, supra,* 550 F.2d at 779. The borrowing statute of the forum state—here, New York—provides that any cause of action which accrues outside the state "cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued." N.Y.C.P.L.R. § 202 (McKinney 1972). Since appellant is an Alaska resident, conducted his business in Alaska, negotiated his purchase of SaCom shares by phone from Alaska, and paid for the shares by check mailed from Alaska, the district court properly determined, and the parties agreed, that the relevant Alaska statute of limitations should apply. After considering several Alaska statutes of limitations,[4] the court held that the proper statute of limitations was Alaska's two year limitations period referred to above.

---

2. This action, *Brady v. LAC, Inc.,* 75 Civ. 1700, was commenced on April 8, 1975 and was assigned to Judge Bonsal. On November 19, 1975, appellant in the instant case intervened as a plaintiff in the *Brady* action. Allegations of false and misleading information in the SaCom registration statement were included among the general claims in the *Brady* complaint. Seidman & Seidman was not named as a defendant. On September 14, 1977, the *Brady* action was settled before Judge Bonsal.

3. Other facts necessary to an understanding of the legal issues upon which we rule will be set forth in connection with our discussion of those issues in the remainder of this opinion.

4. The district court pointed out that Alaska has three potential applicable statutes of limitations: (1) the Alaska blue sky law which provides a three year limitations period, Alaska Stat. § 45.55.220(f); (2) a residual statute which provides a ten year limitations period for actions not otherwise covered, Alaska Stat. § 09.10.100; and (3) the two year statute of limitations which the district court held to be applicable here, Alaska Stat. § 09.10.070.

■ While the law of the forum determines the *length* of the limitations period, federal law determines *when* that period begins to run. *Arneil v. Ramsey, supra,* 550 F.2d at 780. *Accord, Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402, 410 (2 Cir. 1975). The classic statement of this rule is:

"[T]he time from which the statute of limitations begins to run is not the time at which a plaintiff becomes aware of all of the various aspects of the alleged fraud, but rather the statute runs from the time at which plaintiff should have discovered the general fraudulent scheme. '[T]he statutory period . . . [does] not await appellant's leisurely discovery of the full details of the alleged scheme.'" *Berry Petroleum Co. v. Adams & Peck, supra,* 518 F.2d at 410, *quoting from Klein v. Bower,* 421 F.2d 338, 343 (2 Cir. 1970).

Appellant does not deny that the statute of limitations begins to run from the time he *should* have discovered the relevant facts regarding the alleged fraud. He contends, however, contrary to the district court's conclusion, that he " 'exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud.'" *Arneil v. Ramsey, supra,* 550 F.2d at 781, *quoting from Morgan v. Koch,* 419 F.2d 993, 997 (7 Cir. 1969). He further contends that the

factors relied on by the district court were not sufficient from which to conclude as a matter of law that a reasonably diligent person should have discovered the participation of this particular defendant prior to the release of the SEC's Opinion and Order of September 1, 1976 which specifically named Seidman & Seidman as participants in the fraud.[5] Although there were sufficient indicia prior to the SEC release to put appellant on "inquiry notice", he contends that he more than adequately fulfilled his duty to investigate but still was unable to discover the frauds of this particular defendant.

Accordingly, in order to determine whether there was an absence of genuine issues of material fact sufficient to warrant a grant of summary judgment, we next must consider in some detail the factors relied on by the district court in concluding that appellant should have discovered the fraud prior to July 6, 1975 and before the SEC's Opinion and Order of September 1, 1976.

## III.

### RELEVANT FACTORS

■ The central issue in this case is whether the factors relied upon by the district court—in holding that appellant " 'in

---

**5.** This Opinion and Order of the SEC was issued pursuant to Rule 2(e)(1) of the Commission's Rules of Practice and Procedure, 17 C.F.R. § 201.2(e)(1) (1978). We recently upheld the authority of the SEC to promulgate its Rule 2(e) and to conclude its administrative proceedings thereunder before the accountants or other professionals being investigated may resort to the courts. *Touche Ross v. SEC,* 609 F.2d 570 (2 Cir. 1979).

The SEC Opinion here involved set forth in detail a scheme by defendant and the managing underwriter of SaCom which, among other things, involved an agreement on the part of Seidman & Seidman to reduce its bill for services rendered to SaCom by approximately $70,-000 for the purpose of setting forth the liabilities of the company in the financial statements filed in connection with the underwriting and public offering. The remainder of the fee was to be recaptured after the underwriting through the device of over-billing. The SEC Opinion also disclosed that, in an effort to obtain payment of the past fees, the audit partner as-

signed to the SaCom audits solicited a bank, with whom he previously had arranged loans for other clients, to lend money to SaCom. The bank was unwilling to do so unless the loan was guaranteed. Thereupon, the audit partner and his wife, together with another partner and his wife, signed continuing guarantee agreements. Not only was this transaction not disclosed to the public, but certain papers apparently were destroyed in an effort to avoid disclosure.

Moreover, the SEC Opinion stated that certain income and balance sheet accounts had been substantially overstated by the improper capitalization of costs related to test equipment and research costs and by invalid claims against the United States Defense Department. The audit techniques utilized by defendant in the 1972 financial reports were found by the SEC to have been improper. The investigation disclosed that Seidman & Seidman had failed to demand documentation to support management's demands to capitalize certain costs.

the exercise of reasonable diligence', *Arneil v. Ramsey, supra,* [550 F.2d] at 781, . . . should have discovered the alleged fraud before July 6, 1975"—were sufficient to warrant summary judgment. We hold that they were not.

The district court relied basically upon three factors: (1) appellant's own admissions that he thought that he "had been taken" and "swindled"; (2) appellant's participation in the *Brady* action; and (3) a litany of certain public information regarding Seidman & Seidman, including a letter contained in the amendment of SaCom's Form 10–K for the year ending September 30, 1973, the replacement of Seidman & Seidman by another accounting firm, and facts contained in SaCom's 1973 financial statements.

### (A) *Appellant's Admissions*

The district court relied first upon appellant's own admissions that in late 1972 or early 1973 he began to suspect that he "had been taken" and "swindled". His suspicions first were aroused by the precipitous decline in market value of the stock shortly after the public offering in October 1972. Although he had been told at the time of his purchase that the price of the stock would double, the stock had lost 85% of its value by 1973. He contacted several brokers in late 1972 and early 1973 to ascertain the status of the stock. He was informed that the stock had been taken "off the pink sheets". The stock had been dropped by the National Association of Securities Dealers Automated Quote System ("NASDAQ") by May 31, 1973. Appellant "couldn't find anybody that knew anything about it let alone someone who would buy it and [be] dumb enough to." In describing his state of mind at the time, appellant candidly admitted:

> "I God damned near died. Then, of course, I didn't die when I realized I had been suckered into something . . . I was suckered into this phony deal, I realized that I had been taken clean . . . ."

Defendant argues that similar facts alone have been held sufficient to commence the running of the statute of limitations. In particular, defendant relies upon the Seventh Circuit decision in *Hupp v. Gray,* 500 F.2d 993 (7 Cir. 1974). There the plaintiff purchased stock in January 1966 at a price of $47 per share and was told by his broker that the price would rise to $75. The price, however, proceeded to fall. By March 1967, the plaintiff was able to resell his shares for only $17.50 per share. In August 1970, the plaintiff actually discovered the misrepresentations of the defendant by accident through a conversation with a third party. The court held that the plaintiff was on notice of facts which should have led him to the fraud long before his actual discovery of it in August and that his failure to take sufficient steps to discover the true facts barred his recovery—"[i]ndeed, the only conclusion is that he remained narcous until August 1970." *Id.* at 996.

Appellant does not deny that his suspicions were aroused as to the possible existence of a fraud when the value of the shares began to decline. He contends, however, that, unlike the plaintiff in *Hupp,* he exercised reasonable diligence in an effort to uncover the fraud. He hired a lawyer, cooperated with the SEC, and eventually intervened in the *Brady* action. Moreover, unlike *Hupp,* which involved the misrepresentations of a single broker who sold the shares to the plaintiff, the fraud ultimately uncovered by appellant in the instant case involved not only defendant in this action, but the marketmakers, underwriters, and management of SaCom. At the time of the *Brady* action, appellant believed that only the marketmakers and underwriters were involved in the scheme.

### (B) *Brady Action*

The district court relied upon appellant's participation in the *Brady* action as the second major factor which should have alerted him to defendant's complicity in the scheme. The *Brady* action was triggered in part by an SEC Order for Public Proceedings issued June 25, 1974 which charged the

underwriters and marketmakers with market manipulation and other securities laws violations in connection with the public offering of SaCom shares. Securities Exchange Act Release No. 10875 (June 25, 1974). Seidman & Seidman was not specifically named as a defendant in either the SEC Order or the *Brady* complaint. In its Form 8–K for the month of May 1974, however, the company disclosed the SEC investigation regarding the marketmakers and underwriters and stated that there was "another investigation of which the company is aware which the company believes to concern other circumstances relating to the public offering." Defendant contends that this statement, in conjunction with the allegations in the *Brady* complaint charging the marketmakers and underwriters with having "inflated the price of SaCom securities through the dissemination of false and misleading information in the registration statement", should have alerted appellant to possible fraudulent activities on the part of the accountants.

In *Gaudin v. KDI Corp.,* 417 F.Supp. 620 (S.D.Ohio 1976), aff'd, 576 F.2d 708 (6 Cir. 1978), a combination of indicia such as those present here were held sufficient to have placed that plaintiff on "inquiry notice". Among the indicia which the district court in *Gaudin* held should have alerted the plaintiff to the fraud, had he exercised reasonable diligence, were:

"1. The status of the stock in relation to its position on the natural (sic) stock exchanges;

2. The relative values of the stock during the time in question; and

3. The existence of other lawsuits against the defendant company." 417 F.Supp. at 629. *See also Berry Petroleum Co. v. Adams & Peck, supra,* 518 F.2d at 410.

Defendant contends that all of the factors present in *Gaudin* are present in the instant case, pointing to the fact that when the SaCom stock was taken "off the pink sheets" its value dropped rather than doubling as forecast and the fact that other litigation had been commenced against Sa-

Com as a result of the offering. Defendant also points out that in *Arneil v. Ramsey, supra,* our Court held that an SEC release relating to the alleged fraudulent scheme was sufficient to commence the running of the statute of limitations. In view of the SEC's 1974 Order, defendant contends that the information available to appellant was sufficient to arouse his suspicions and he should be charged then at the latest with knowledge of defendant's fraud. Defendant reminds us that the Supreme Court stated in *Wood v. Carpenter,* 101 U.S. 135, 141 (1879): " 'Whatever is notice enough to excite attention and put the party on his guard and call for inquiry, is notice of everything to which such inquiry might have led. . . .' "

Appellant argues, on the other hand, that there is nothing in any of these matters relied on by defendant which would have led him to suspect the wrongdoing of Seidman & Seidman. There was nothing in either the SEC's 1974 Order or the *Brady* action which indicated any involvement on the part of Seidman & Seidman. Indeed, appellant contends that, until the SEC's 1976 Opinion and Order was released, specifically charging Seidman & Seidman with participating in the fraudulent scheme, he believed that his losses were due entirely to the actions of the marketmakers and underwriters.

These competing contentions of the parties serve to point up some of the genuine issues of material fact which we hold should be resolved at trial.

(C) *Public Information*

The district court, however, concluded that certain publicly disseminated information about Seidman & Seidman and the audit of the 1972 financial statements should have led appellant to discover Seidman & Seidman's participation. In particular, the court emphasized a letter from Seidman & Seidman withdrawing the 1972 reports and stating that defendant's opinions "should no longer be relied upon by you or by anyone to whom they have been furnished by you." The letter, dated January

28, 1974, was addressed to the Board of Directors and shareholders of SaCom and was included in an amendment to the company's Form 10–K for the year ending September 30, 1973. Defendant has asserted that this letter was widely disseminated not only to the Board of Directors, but also to the shareholders, including presumably appellant. Appellant, however, not only disputes the accuracy of this contention, but he claims that the letter was delivered only to the corporate headquarters of SaCom and that the contents of the letter never were disclosed to appellant or to any of the other shareholders.

In addition, the district court relied on the fact that in November 1973 Seidman & Seidman was replaced by Wolf & Co. as auditors with respect to the 1973 financial statements of SaCom. These financial statements revealed a loss of more than $2 million dollars—a loss which occurred as the result of a combination of factors, including substantial reductions in inventories, research and development costs, and costs in excess of billings. The company's Form 10–K for the year ending September 30, 1973 states:

> "The substantial loss reported for the year ended September 30, 1973 developed from a combination of adverse factors:
> 1. During the course of the year, primarily during the second and third fiscal quarters, Registrant determined that costs expended to date and additional costs required to complete three government contracts were substantially in excess of those previously used to determine the value of inventory and other assets. Substantial readjustments resulted in recognition of losses on these contracts of approximately $1,000,000. Registrant's extraordinary efforts to complete performance on these contracts also disrupted other operations and reduced income from other contracts.
> 2. Substantial uncertainty arose during the fiscal year with respect to the amount which may be realized on contract performance claims totalling approximately $600,000 which were recorded in prior years. Therefore, the claims were written down to a nominal value.

> 3. The sharp decline in the market value of Registrant's common stock resulted in a significant reduction of approximately $100,000 in the carrying value of notes receivable. . . .
> 4. It is Registrant's accounting policy to write off research and development costs relating to projects which have become commercially nonfeasible or are abandoned. In accordance therewith, the Registrant wrote off approximately $321,000 of unamortized research and development expenditures capitalized in prior years."

Moreover, Wolf & Co. qualified its report on the company by stating:

> "[W]e do not express an opinion on the accompanying consolidated statements of income, changes in financial position, and shareholders' equity for the year ended September 30, 1973 *or on the consistency of application of accounting principles with the preceding year.*" (emphasis added).

Defendant contends that the district court properly found that these combined factors—including the decline in value of the shares, the *Brady* action, and the replacement of Seidman & Seidman by Wolf & Co.—when viewed in conjunction with the letter from defendant and the qualified statements of the replacement auditors, were sufficient to put appellant on notice of the fraud of this particular defendant. Defendant further contends that, since the complaint charges that research and development items were improperly capitalized and the company's 1972 balance sheet and income statements were inflated by an alleged scheme which recognized as income a claim against the United States on a defense contract, there was sufficient information prior to 1974 which would have permitted appellant to frame his complaint against Seidman & Seidman.

We believe that enough has been said to demonstrate that the very factors relied upon by the district court to support its conclusion—namely, that if appellant had

exercised due diligence he should have discovered the alleged fraud before July 6, 1975—involve genuine issues of material fact, giving due regard to the conflicting inferences drawn by the parties from the facts. This brings us to a consideration of the proper standard for summary judgment, particularly in a securities fraud case.

## IV.

### STANDARD FOR SUMMARY JUDGMENT

■ It is well established that on a motion for summary judgment under Fed.R. Civ.P. 56, the moving party has the burden of showing that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 494 F.2d 168, 171 (10 Cir. 1974); *Friedman v. Meyers,* 482 F.2d 435, 438–39 (2 Cir. 1973). The critical question in the instant case is when did appellant actually know, or in the exercise of due diligence should have known, of the fraudulent activities of Seidman & Seidman. As we held in *Friedman, supra,* the party seeking summary judgment has the burden of establishing that there is no dispute with regard to this question:

> "[I]ssues are raised as to the state of mind, intent and knowledge of the parties. We have repeatedly stated that summary judgment is particularly inappropriate where, as here, it is sought on the basis of 'the inferences which the parties seek to have drawn [as to] questions of motive, intent, and subjective feelings and reactions.' " 482 F.2d at 439.

*Accord, Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, supra,* 494 F.2d at 171.

■ Issues of due diligence and constructive knowledge depend on inferences drawn from the facts of each particular case—similar to the type of inferences that must be drawn in determining intent and good faith. *Byrd v. Bates,* 243 F.2d 670, 674 (5 Cir. 1957). Defendant cites numerous cases in which summary judgment has been granted in this Circuit on the ground that the action was time-barred, *e. g., Stull v. Bayard,* 561 F.2d 429 (2 Cir. 1977), *cert. denied,* 434 U.S. 1035 (1978); *Arneil v. Ramsey, supra; Klein v. Bower,* 421 F.2d 338 (2 Cir. 1970); *Daniels v. Ernst & Ernst,* [1976–1977 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,871 (S.D.N.Y.1977). When conflicting inferences can be drawn from the facts, however, summary judgment is inappropriate. *Byrd v. Bates, supra,* 243 F.2d at 674. *Accord, Sperry v. Barggren,* 523 F.2d 708, 710 (7 Cir. 1975); *Tomera v. Galt,* 511 F.2d 504, 510–11 (7 Cir. 1975); *Benjamin v. Western Boat Building Corp.,* 475 F.2d 1085, 1086 (9 Cir. 1973); *deHaas v. Empire Petroleum Co.,* 435 F.2d 1223, 1227 (10 Cir. 1970).

In the instant case, it not only is possible to draw, but the parties indeed do draw, conflicting inferences from the various factors relied on by the district court. Granted that the district court's conclusion that appellant should have discovered the fraudulent activities of Seidman & Seidman before July 6, 1975 is plausible, a contrary conclusion also may be reached.

First, the decline in the value of the stock clearly is a factor that should have alerted appellant to the possible existence of a fraud. The rapid decline, however, also might well be attributed to a myriad of other causes, including, but not limited to, embezzlement, unfavorable market conditions, poor management or fraud. There is nothing that would point conclusively to Seidman & Seidman.

Appellant's suspicions nevertheless *were* raised. He undertook an intensive investigation, cooperated with the SEC, and intervened in the *Brady* action. There was nothing, however, in the *Brady* complaint or the 1974 SEC Order which pointed specifically to Seidman & Seidman. Indeed, appellant contends that there was nothing discovered by him which would have led even the most sophisticated investor to conclude that Seidman & Seidman was involved in any way in the fraud. Although there were allegations in the *Brady* complaint that the price of the shares had been inflated through false and misleading infor-

mation in the registration statement, appellant and his attorneys stated in affidavits that the facts did not implicate Seidman & Seidman. Rather, appellant was under the impression that the losses were due solely to the illegal manipulations of the marketmakers and underwriters.

Moreover, the publicly disseminated facts relied on by the district court also may be construed to support appellant's position. The 1973 financial statements indicating a net loss of more than $2,000,000 do not suggest that the 1972 financial statements were in any way fraudulent. Indeed, appellant contends that the statements contained exculpatory language which tends to conceal rather than disclose Seidman & Seidman's fraud. In particular, he points to that portion of Form 10-K which stated that losses were due to a combination of adverse factors, including additional costs required to complete three government contracts, a sharp decline in the market value of the common shares, and the write-off of approximately $321,000 of unamortized research expenditures capitalized in previous years. These statements, according to appellant, could lead a reasonable investor to believe that the losses were due entirely to normal business losses.

Finally, with regard to the letter of withdrawal written by Seidman & Seidman in connection with the 1972 reports, appellant first contends that the letter was not disseminated widely. More important, however, he asserts that there is nothing in the letter itself which would lead one to the conclusion that the accounting firm was withdrawing its reports because it had engaged in the dissemination of fraudulent statements and omissions. The warning that the firm's opinions no longer should be relied upon conceivably could be read as a disclaimer based on changed market conditions. Similarly, the replacement of Seidman & Seidman by another accounting firm is not an indicium of fraud; changes of accounting firms occur daily in the business world. The fact that the new accounting firm declined to express an opinion on the accounting practices of its predecessor was a factor considered by the district court as

pointing to fraud on the part of Seidman & Seidman. This does not strike us as persuasive. Such a disclaimer is normal when one accounting firm replaces another—particularly when, as here, the second firm purportedly did not even examine its predecessor's statements.

Viewing the inferences to be drawn from the underlying facts in the light most favorable to appellant, *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *United States v. Diebold, Inc., supra,* 369 U.S. at 655, we do not agree with the district court that appellant, as a matter of law, should have discovered the fraud of Seidman & Seidman before July 6, 1975. The various incidents here involved occurred over a period of years. Even looking back at them with the benefit of hindsight, it cannot be said as a matter of law that a reasonable investor, if confronted with these facts, should have discovered the fraud on the part of Seidman & Seidman before July 6, 1975.

■ Moreover, in determining whether appellant exercised due diligence in his attempt to discover the participation of Seidman & Seidman, it is significant that it was not until 1976 that the SEC was able to name these accountants as participants in the fraud. Although the Seidman & Seidman letter withdrawing the 1972 reports may well be the strongest fact supporting the district court's conclusion, it is not unreasonable to believe, as did appellant, that the market makers and underwriters were solely responsible. If the SEC with its commendable expertise and specialized investigative teams was unable to discover the complicity of these accountants until shortly before its Opinion and Order of September 1, 1976 was released, it cannot be said as a matter of law that appellant should have discovered their participation any earlier.

In light of the conflicting inferences which may be drawn from the material facts in this case, we hold that the district court erroneously concluded that summary judgment was proper. The question wheth-

er appellant exercised due diligence, and thus is not precluded by the statute of limitations from maintaining this action, is a question of fact that should be determined by the jury as the trier of the facts.

## V.

## FEDERAL EQUITABLE TOLLING DOCTRINE

■ The district court on December 27, 1977 granted appellant's motion to amend his complaint to allege fraudulent concealment on the part of Seidman & Seidman. The amended complaint alleged that Seidman & Seidman concealed its fraudulent conduct by altering its accounting work papers and destroying documentary evidence. The amended complaint further alleged that the allegations referred to above were buttressed by the SEC Opinion and Order of September 1, 1976. The district court was correct in allowing appellant to amend his complaint in view of the facts alleged therein.

■ In addition to arguing that due diligence was exercised in discovering defendant's alleged fraud, appellant contends that the statute of limitations was tolled by reason of this alleged fraudulent concealment until actual discovery of the underlying fraud. *See Tomera v. Galt, supra,* 511 F.2d at 510. Under the federal equitable tolling doctrine, the active concealment of fraudulent conduct tolls the statute of limitations in favor of the defrauded party until such time as he actually knew of the fraudulent conduct of the opposing party. *See Atlantic City Electric Co. v. General Electric Co.,* 312 F.2d 236, 239 (2 Cir. 1962) (en banc), *cert. denied,* 373 U.S. 909 (1963). As Judge Tone stated in his excellent opinion for the Seventh Circuit in *Sperry v. Barggren, supra,* 523 F.2d at 711 (citations omitted):

"One issue before the District Court was thus the presence or absence of concealment. Should active concealment be found, then the statute is tolled until actual discovery. . . . If no active concealment is present, then the issue becomes whether knowledge of the al-

leged fraud could reasonably have been acquired [at an earlier date] with the exercise of due care."

In *Sperry,* the court reversed a summary judgment of the district court which had sustained a statute of limitations defense in a securities fraud action under § 10(b) and Rule 10b–5. Judge Tone's opinion is one of the leading ones dealing with the federal equitable tolling doctrine. We agree with Judge Tone's opinion.

Although the district court allowed the amendment of the complaint referred to above, it held that "the federal equitable tolling doctrine cannot be invoked" because "[d]efendant's public admission that its financial reports should no longer be relied upon undermines any claim of fraudulent concealment".

In view of our holding above that the Seidman & Seidman letter of January 28, 1974 is not conclusive, as a matter of law, as to when appellant should have had knowledge of the fraud, it follows that it likewise is not conclusive on the issue of fraudulent concealment. Since we are reversing the summary judgment and remanding the case for trial on all issues of fact, suffice it to say that among the issues to be determined by the jury, under proper instructions from the court, is whether there was fraudulent concealment sufficient to invoke the federal equitable tolling doctrine.

## VI

## SUMMARY

To summarize:

(1) We hold that the district court correctly determined that the two year Alaska statute of limitations is the proper one to be applied here.

(2) We hold that the district court erred in granting summary judgment in favor of defendant and in dismissing the complaint, since we hold that there are genuine issues of material fact and defendant is not entitled to judgment as a matter of law.

(3) We reverse and remand the case to the district court for jury trial, under

proper instructions from the court, on all issues of fact, including whether, if plaintiff had exercised due diligence, he should have discovered the alleged fraud on the part of Seidman & Seidman before July 6, 1975; and whether there was sufficient concealment on the part of Seidman & Seidman to invoke the federal equitable tolling doctrine.

Reversed and remanded.