Frank MENKE, et al., Plaintiffs,

v.

Daniel GLASS, individually, and Migdal,
Tenney, Glass & Pollack, a
Partnership, Defendants.

No. 93 Civ. 7072 (DC).

United States District Court,
S.D. New York.

Sept. 25, 1995.

Gersten, Savage, Kaplowitz & Curtin by Edward R. Curtin, New York City, for Plaintiff Frank Menke.

Gross, Levin & Fazio by Louise S. Horowitz, Elmhurst, New York, for Limited Partner Plaintiffs.

Levy, Sonet & Siegel, by Steven G. Sonet, New York City, for Defendant Glass.

Rosenman & Colin by Gerald Walpin, New York City, for Defendant Migdal, Tenney, Glass & Pollack.

### MEMORANDUM DECISION

CHIN, District Judge.

This is a case brought by a group of investors in a limited partnership against one of the general partners, Daniel Glass, and Mr. Glass's law firm, Migdal, Tenney, Glass & Pollack. Plaintiffs allege that defendants defrauded them and breached their fiduciary duties with respect to the purchase of a motion picture. Defendants move for summary judgment, on the basis that plaintiffs' claims are barred by the applicable statutes of limitations. For the reasons stated below, the motion is denied.

### FACTS

In August 1981, a group of investors formed a limited partnership ("Prince Associ-

ates") to purchase a movie, "Prince of the City," from Orion Pictures Company ("Orion"). Plaintiffs are a number of those investors, each a limited partner with the exception of plaintiff Frank Menke, who was a general partner. Defendant Daniel Glass was the other general partner of the partnership; defendant Migdal, Tenney, Glass & Pollack was a limited partner and served as counsel to the partnership.

The purchase price for the movie was $11.875 million, which was to be comprised of $100,000 cash at the closing, $1.4 million payable on February 1, 1982, a recourse purchase money note in the amount of $6.025 million (the "Recourse Note"), and a nonrecourse purchase money note in the amount of $4.35 million (the "Non–Recourse Note"). Both notes matured on January 10, 1990. Each partner purchased a unit (or share of a unit) costing $176,000, $61,000 to be paid in cash with the balance guaranteed by personal notes on a letter of credit due on January 10, 1982 and January 10, 1983. By purchasing the film, the partners received the right to claim certain tax deductions and credits and the right to receive license fees measured by varying percentages of the adjusted gross receipts made by the movie. Following the purchase, the partnership immediately leased the movie back to Orion for promotion and distribution. The arrangement was intended as a profit-making vehicle and as a tax-shelter for the limited partnership; Orion would benefit because it would be given ready cash to finance the movie.

Prior to purchasing the film, the limited partners were given a Private Offering Memorandum ("POM") and a Notice of Availability ("NOA"). Both documents warned that the investment posed a high degree of risk and that there was no assurance that the gross receipts would cover the amounts that were to become due on the Recourse Note or return a profit. The documents also stated that the IRS would likely challenge any tax deductions or credits taken. In addition, the POM required that each partner have a net worth of at least $400,000, an adjusted gross income that would place the partner in a 50% tax bracket, and the ability to afford a total loss on the investment.

Pursuant to a Distribution Agreement between Orion and Prince Associates, Orion was obligated to spend $11.875 million by December 31, 1982 in advertising the film, $4 million of which would be provided by the partnership. According to the POM and paragraph 14 of the Distribution Agreement (which was not attached to the POM), if Orion spent more than $4 million but less than $11.875 million advertising the film, it was obligated to pay the partnership whatever amount in excess of $4 million (up to a maximum of $7.875 million) was not used by January 10, 1990, the same day that the notes became due (the "Excess Advertising Funds").[1] As it turned out, Orion spent only slightly more than $4 million in advertising the movie. Hence, under the AEDP, Orion was obligated to repay the partnership the Excess Advertising Funds.

With respect to repaying the Recourse Note, the Purchase Agreement and the Distribution Agreement provided that Prince Associates' share of the gross receipts from the movie would be applied to reduce the unpaid principal balance of the Recourse Note. The parties also agreed that the partners' share of the gross receipts to be credited against the amount due on the Recourse

---

1. The POM provision, which defendants refer to as the "Advertising Expenditure Deficiency Provision" ("AEDP") and which plaintiffs term the "Additional Licensing Fee," provides as follows:

   In addition to the $4,000,000 to be expended by [Prince Associates] for advertising the Picture, Orion is committed to spend not less than an additional $7,875,000 on or before December 31, 1982 for advertising the Picture, failing which it is obligated to pay [Prince Associates] on January 10, 1990 a sum equal to the difference between the amount of advertising expenditures actually made by Orion by said date and the sum of $7,875,000.

(POM at 5).
   The language in the Distribution Agreement is similar, and states in relevant part:
   In the event Orion shall fail to expend at least said excess of $7,875,000 by December 31, 1982, the difference between said $7,875,000 and the excess actually expended by Orion by said date for advertising the Films shall be paid to [Prince Associates] on January 10, 1990 as an additional license fee hereunder; i.e., in addition to the sums payable to [Prince Associates] pursuant to Exhibit A annexed hereto.
(Distribution Agreement, ¶ 14 at 5).

Note would be "multiplied up" and capped by the outstanding principal balance on the Recourse Note on its maturity date. (POM at 4). Under this multiplication formula, which was contained in ¶ 3–1 of Appendix A to the Distribution Agreement, the Recourse Note would be satisfied if the picture grossed about $1.5 million. In fact, on January 10, 1990, when the Recourse Note became due, the "multiplied receipts" were sufficient to satisfy the Recourse Note.

Paragraph 3–1 also contained language that apparently contradicts the AEDP and that is at the heart of this dispute. It provided that "the aggregate of (i) the proceeds and sums remitted or remittable to [Prince Associates] and applied or applicable to the reduction of said principal and interest and (ii) the amount payable to [Prince Associates] pursuant to this Paragraph 3–1 shall not exceed the then unpaid principal amount of the Appendix A Note [Recourse Note] and the Appendix B Note [Non–Recourse Note] and the interest on said Notes." This provision was later cited by Orion to support its refusal to reimburse Prince Associates for the Excess Advertising Funds. Orion was of the view that under this provision, if there were no amounts due on the Recourse Note (because the "multiplied receipts" were sufficient to satisfy the Recourse Note), then Orion would not be obligated to pay Prince Associates any sums under the AEDP, no matter how little of the $7.875 million it had actually spent advertising the film.[2]

The deal closed on August 19, 1981, the same day that the picture was released. The movie, despite generally favorable reviews, failed at the box office, and on February 25, 1982, the partnership was advised of the loss. The limited partners were also advised that the general partners were considering suing Orion. The general partners did retain a law firm, but ultimately decided against a lawsuit. Clearly unhappy with the way the investment turned out, one of the plaintiffs, Richard Scobey, wrote to defendant Glass in December 1982 criticizing the general partners' handling of the partnership. Scobey also wrote to the limited partners seeking funds for a possible lawsuit against the general partners.

On February 24, 1983, defendant Glass notified the limited partners of an impending tax audit concerning the partnership. In 1984, the Internal Revenue Service informed the partnership of its decision to disallow any deductions and credits. Litigation between Prince Associates and the IRS ensued in the Tax Court during October and November 1986. The AEDP was not mentioned during the course of the trial but was raised in Prince Associates' post-trial reply brief in response to the IRS' contention that tax benefits were not available to the partnership since the AEDP guaranteed the return of the limited partners' investments regardless of the box office success of the movie. The partnership's counsel argued that, in actuality, the AEDP, together with any other funds to which the partnership was entitled, was limited to the amount outstanding on the Recourse Note, *i.e.*, that the partnership's cash contribution could not be recouped by Orion's failure to spend its full advertising budget.

In 1989, the Tax Court rejected Prince Associates' argument and held that since Orion was obligated to pay Prince Associates the Excess Advertising Funds, the partners were not at risk in their investment and consequently were not entitled to any tax deductions or credits. Represented by new counsel, the partnership appealed to the Eighth Circuit and in its brief argued that the AEDP was capped at the balance, if any, outstanding on the Recourse Note. The Eighth Circuit, however, was not convinced, and affirmed the Tax Court in January 1991. *Upham v. Commissioner*, 923 F.2d 1328, 1337–38 (8th Cir.1991). The limited partners were informed of each stage of the Tax Court trial and of the appeal to the Eighth Circuit.

On August 15, 1988, while the lawsuit with the IRS was pending, plaintiff Menke wrote to the limited partners advising them of his intention to dissolve the partnership; by letter dated October 24, 1988, Menke informed the partners that he proposed to file a final tax return and make a final distribution to

---

**2.** A tax opinion rendered by Arnold & Porter on behalf of the partnership reached the opposite conclusion, namely, that Orion was obligated to repay the Excess Advertising Funds.

the partners of all funds to which they were entitled before dissolving the partnership. Accompanying this letter was a report by an accounting firm that listed the partnership's assets as $111,000, apparently excluding any entitlement to funds under the AEDP. Menke also provided a *pro forma* partnership tax return that showed nothing for the partnership's accounts receivable.

Defendant Glass also wrote to the limited partners on October 5, 1988, opposing dissolution and recommending that the partnership sell the picture back to Orion for a favorable price in order to pay off the purchase Notes. Following these contradictory letters, Menke and Glass wrote the limited partners in November 1988 advising them about the negotiations with Orion to have Orion repurchase the movie from the partnership for $20,000 plus forgiveness of all of Associates' obligations on the Recourse Note. This offer was ultimately rejected.

Orion did not make any payment to Prince Associates on January 10, 1990, as required by the AEDP. In August 1990, the partnership commenced a lawsuit against Orion to recover the AEDP amount, approximately $7.6 million. *Prince Assocs. v. Warner Bros., Inc.,* Index No. 4131/91 (Sup.Ct. N.Y.Co.).[3] A motion for summary judgment by the partnership was denied because of the existence of issues of fact. On appeal, the First Department affirmed the denial of summary judgment, holding that the Distribution Agreement was ambiguous with respect to whether Orion was obligated to pay the partnership for the Excess Advertising Funds, and stating that "extrinsic evidence" would be admissible to determine the parties' intent. 180 A.D.2d 483, 483, 580 N.Y.S.2d 653, 653 (1st Dep't.1992). Both Menke and Glass testified in depositions that the AEDP was an unconditional obligation of Orion; Orion representatives, on the other hand, testified that the AEDP was capped at the amount of the balance outstanding on the Recourse Note as of January 10, 1990.

By letter dated June 18, 1993, Menke and Glass informed the limited partners of a proposed settlement of the lawsuit against Orion, under which the partnership would give up all of its claims against Orion, including the AEDP claim, and in return would be paid $1 million for the resale of the movie to Orion. This settlement was ultimately rejected by one of the limited partners; the case was later settled on similar terms. These facts are not in dispute.

Plaintiffs commenced this action on October 12, 1993, more than 12 years after the limited partnership was formed and the movie was purchased, alleging that defendants breached their fiduciary duties to them and engaged in fraud. Specifically, plaintiffs claim that defendants had deliberately obfuscated paragraph 3–1 in negotiating with Orion in an attempt to lull plaintiffs into a false sense of security.[4]

Defendants move for summary judgment arguing that plaintiffs' claims are time-barred. Defendants contend that plaintiffs' claims accrued when plaintiffs received a copy of the POM in 1981 that contained language contradictory to the Distribution Agreement. Defendants also assert that numerous events occurred to put plaintiffs on

---

3. Orion Pictures Company had gone bankrupt in late 1982 and had been acquired by Warner Bros. For ease of reference, I will continue to refer to Orion.

4. In support of this claim, plaintiffs rely on the deposition testimony of an attorney for Orion who was involved in negotiating the Distribution Agreement. When asked why language that had appeared in an earlier draft of the Distribution Agreement spelling out the cap on the AEDP was omitted from the final agreement, the attorney responded:

A ... Prince [Associates] thought that it was too blatant, and we settled on language that we felt protected us and served their purpose....

Q What was too blatant about this language in the May draft, which was different in the language in the final document?
A You have to ask Prince that. They didn't want to say it straight out in such blatant language, and so we agreed on more subtle language.
Q What did they not want to say straight out?
A That the 7875 was absolutely limited in plain language, limited to the—It was capped by the—They didn't want to say it in so many words.

(Schwartz Dep. at 135).

notice of fraud well in advance of the commencement of this action.

Plaintiffs counter that none of the events cited by defendants was sufficient to put them on notice of fraud or breach of fiduciary duty because each event was susceptible to a conflicting but reasonable interpretation. In addition, plaintiffs argue that they could not have discovered the alleged fraud and breach until the action against Orion was settled and certain revelations concerning the initial negotiations between Orion and Glass became known because of defendants' concealment.

## DISCUSSION

### I. Standards for Summary Judgment

The standards applicable to motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, *id.* at 255, 106 S.Ct. at 2513 (*citing Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970)), there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. As the Court stated

in *Anderson,* "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. at 2511 (citations omitted). With these standards in mind, I turn to defendants' motion for summary judgment.

### II. Statute of Limitations

The parties agree that the statute of limitations for plaintiffs' fraud claim is either six years from the date of the alleged fraud or two years from the date the fraud was, or through the exercise of reasonable diligence could have been, discovered, whichever is later. New York CPLR 203(g), 213(8) (McKinney 1990 & Supp.1995); *see Marathon Enter., Inc. v. Feinberg,* 595 F.Supp. 368, 371 (S.D.N.Y.1984).[5]

The appropriate standard of limitations for plaintiffs' breach of fiduciary duty claim is somewhat less clear. While the parties agree that the CPLR provides a six year statute of limitations for the fiduciary duty claim (*see* CPLR § 213(1); *see also* CPLR § 213(2)), the parties disagree as to whether a "discovery rule" should apply: defendants argue that it does not; plaintiffs contend that it does and that the six year period does not begin running until they had actual or constructive knowledge of the breach. I agree with plaintiffs' position and consequently hold that the limitations period for the fiduciary duty claim is tolled until, through the exercise of reasonable diligence, plaintiffs had actual or constructive knowledge of the breach. *See Fisher v. Reich,* 1995 WL 23966, *9 (S.D.N.Y. Jan. 10, 1995) (New York statute of limitations for breach of fiduciary duty claim is six years from "actual or constructive discovery of the injury"); *Zola v. Gordon,* 685 F.Supp. 354, 374 (S.D.N.Y.1988) (New York statute of limitations for breach of fiduciary duty claim "does not commence running until the plaintiff has actual or constructive knowledge of the breach"); *Elghanayan v. Victory,* 192 A.D.2d 355, 355, 596 N.Y.S.2d 35, 36 (1st Dep't.1993) (statute of

---

**5.** In their memoranda of law, both sides have applied New York law.

limitations for breach of fiduciary duty claim begins to run on "date of discovery").[6]

■ Accordingly, as to both applicable statutes of limitations, the critical question is whether the circumstances of this case put plaintiffs on notice of defendants' alleged fraud and breach of fiduciary duty and if, through the exercise of reasonable diligence, they would have discovered the wrongdoing. *See Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir.1983); *Robertson v. Seidman & Seidman*, 609 F.2d 583, 587, 589–92 (2d Cir.1979); *Lenz v. Associated Inns & Restaurants Co. of America*, 833 F.Supp. 362, 370 (S.D.N.Y. 1993). Although the determination of whether a plaintiff has exercised sufficient diligence is normally a question of fact for the jury to decide, *see McMahan & Co. v. Wherehouse Entertainment, Inc.*, 859 F.Supp. 743, 756 (S.D.N.Y.1994), *aff'd in part, rev'd in part on other grounds*, 65 F.3d 1044 (2d Cir.1995), it is an objective standard and summary judgment may be appropriate if the circumstances of the case were such that a reasonable investor would have thought to inquire and respond. *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994); *Armstrong*, 699 F.2d at 88.

Defendants have the onerous burden of proving that there is no issue of fact as to whether plaintiffs would have discovered the fraud and breach of fiduciary duty through the exercise of reasonable diligence. *See McMahan*, 859 F.Supp. at 756 (defendants have "extraordinary burden" of convincing the court that summary judgment is appropriate on issue of inquiry notice). In addition, defendants must show that the information available to plaintiffs suggested the *probability*, not just the possibility, of fraud. *See In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.*, 815 F.Supp. 620, 638 (S.D.N.Y.1993) (*citing Armstrong*, 699 F.2d at 88)). Thus, summary judgment based on inquiry notice is rare. *See Fisher*, 1995 WL 23966 at *4.

Because the issues of due diligence and constructive knowledge depend upon inferences drawn from the facts of each case, when different inferences can be drawn, summary judgment is inappropriate. *See Seidman & Seidman*, 609 F.2d at 591; *McMahan*, 859 F.Supp. at 756; *Phillips v. Kidder, Peabody & Co.*, 782 F.Supp. 854, 859 (S.D.N.Y.1991). Many such conflicting inferences are present in this case. Accordingly, the motion for summary judgment must be denied.

Defendants argue that plaintiffs were put on inquiry notice or had constructive knowledge of the alleged fraud and breach of fiduciary duty on several occasions between 1981 and 1991: 1) in August 1981 upon receiving the POM; 2) in October 1982, when they were informed that the movie was a financial disaster and that the general partners were considering a lawsuit against Orion; 3) between 1986 and 1990 during the litigation in the Tax Court and on appeal to the Eighth Circuit; 4) in 1988 upon receiving the general partners' proposal to either dissolve the partnership or sell the movie back to Orion and the *pro forma* tax return that omitted any mention of the AEDP; 5) in January 1990 upon Orion's failure to repay the Excess Advertising Funds; and 6) on April 15, 1991 when the partnership filed a K–1 tax report that omitted the film as an asset. Each of these arguments is rejected.

■ Defendants are correct that the existence of factual discrepancies in available documents is one factor that would put a reasonable investor on inquiry notice. *See Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F.Supp. 243, 250–51 (S.D.N.Y. 1993). While I am not persuaded by plaintiffs' argument that they did not read the underlying transaction documents because they were relying on Glass's knowledge and experience or on other professionals' guidance, *see Fisher v. Reich*, 1995 WL 23966 at *4 (rejecting plaintiff's position that reviewing a summary of an offering was sufficient diligence because "a reasonable investor

---

6. In any event, plaintiffs' breach of fiduciary duty claim sounds in fraud. In similar situations, courts have applied the fraud statute of limitations. *See Dymm v. Cahill*, 730 F.Supp. 1245, 1264 n. 7 (S.D.N.Y.1990) (*citing Fava v. Kaufman*, 124 A.D.2d 42, 511 N.Y.S.2d 447 (3d Dep't. 1987)).

would have read the [private placement memorandum] and familiarized himself with the potential for loss, rather than relying on the assurances of an advisor"), I nevertheless conclude that a reasonable fact-finder could find that even if plaintiffs had reviewed the Distribution Agreement, it would not have put them on notice of the fraudulent activity alleged in the complaint. The IRS, the Tax Court and the Eighth Circuit Court of Appeals all missed the inconsistent provision in paragraph 3-1 of Appendix A to the Distribution Agreement; rather, all three read the Distribution Agreement as requiring Orion to repay the Excess Advertising Funds.[7] If none of these entities discovered the contradictory provision or interpreted paragraph 3-1 as conflicting with the POM, I cannot conclude as a matter of law that plaintiffs' failure to do so was unreasonable. See Seidman, 609 F.2d at 592 (where SEC, with its expertise and investigative abilities, did not discover defendants' fraud, it would be unreasonable to insist that plaintiff also discover fraud).

In addition, plaintiffs allege that Glass, in his negotiations with Orion, deliberately made the language of paragraph 3-1 ambiguous so as to lull investors into believing that they had a "safety net" for their investment through the AEDP, a contention which Glass refutes. Thus, there is a question of material fact as to whether plaintiffs, through reasonable due diligence, could have discovered the discrepancy.[8]

■ Defendants next argue that plaintiffs were on inquiry notice as of October 1982

when they received letters from the general partners proposing to sue Orion following the dismal performance of the movie. In essence, they contend that because plaintiffs were to receive the Excess Advertising Funds in 1990, it would have been a useless exercise to force Orion to spend more money to promote the movie and thus plaintiffs should have realized something was amiss. Defendants also cite the Scobey letters as a circumstance that should have put plaintiffs on inquiry notice.

Plaintiffs respond that none of these events was sufficiently unusual to put them on inquiry notice of fraud because they were interested in recouping as much of their investment immediately, as opposed to waiting eight years, during which period events could occur that might interfere with their investment.[9] (See, e.g., Robert Scissors Aff. ¶ 7; Robert Schoor Aff. ¶ 13-14). Suing Orion to spend additional money to promote the movie could accomplish that goal because the promotion would have helped make the movie a success. (See Letter from Daniel Glass to potential investor dated June 23, 1981, attached as Exh. 15 to plaintiffs' response). Because conflicting inferences can be drawn from the fact that the general partners considered commencing a lawsuit against Orion in 1982, plaintiffs cannot be deemed at this juncture to have known of the fraud at that time. See McMahan, 859 F.Supp. at 756 (conflicting inferences as to inquiry notice required denial of motion for summary judgment based on statute of limitations); Phillips, 782 F.Supp. at 859, 862 (same).

---

7. Likewise, the Supreme Court and the First Department also found that the documents were ambiguous.

8. Defendants assert that the Second Circuit's ruling in Block v. First Blood Assocs., 988 F.2d 344 (2d Cir.1993), governs this case and requires its dismissal. I do not agree. The plaintiffs in Block were investors in a limited partnership created to purchase a movie entitled "First Blood." Id. at 347. The private placement memorandum indicated that the partnership would receive all rights to the movie from the distribution company. Id. at 348. The purchase agreement, however, provided that the distribution company would reserve many rights, including the music, merchandising and television rights. Id. The Block plaintiffs sued the part-

nership, alleging that because of the partnership's failure to disclose that it did not have all rights to the film, plaintiffs lost valuable tax deductions and credits. Id. at 348-49. The Second Circuit affirmed the district court's dismissal of the case on statute of limitations grounds, reasoning that had the plaintiffs reviewed the purchase agreement before investing, they would have discovered that the partnership did not own all rights to the movie. Id. at 349.

Block is clearly distinguishable since the Distribution Agreement in this case was ambiguous, causing two courts to interpret the AEDP as plaintiffs did.

9. Plaintiffs were not entirely off the mark in this assumption, as Orion went bankrupt in late 1982.

■ Defendants contend that the partnership's position in the Tax Court and on appeal to the Eighth Circuit from 1986–1990 gave plaintiffs sufficient warning to trigger inquiry notice. Had plaintiffs read the posttrial briefs or the briefs to the Eighth Circuit, defendants argue, they would have known that paragraph 3–1 contradicted the AEDP and that there was a strong probability that Orion would not be obligated to repay the Excess Advertising Funds. Plaintiffs counter that it was reasonable for them, as limited partners, to rely on the general partners to keep them informed as to the progress of the cases. I agree to the extent that I find the existence of a genuine issue of material fact. It was not unreasonable as a matter of law for plaintiffs to have delegated the day to day management of the partnership to the general partners and to rely on the general partners to defend the partnership's best interests in the tax litigation. Indeed, limited partners are constrained by law from participating in the management of the partnership. *See Goldman, Sachs & Co. v. Michael,* 113 A.D.2d 326, 329, 496 N.Y.S.2d 427, 429 (1st Dep't 1985); N.Y.Partnership Law §§ 96, 98, 99 (McKinney 1988). In addition, the decisions of the Tax Court and the Eighth Circuit supported the plaintiffs' position that they were entitled to a refund under the AEDP and thus would not have caused a reasonable investor any alarm.

■ Defendants next argue that the general partners' suggestion to dissolve the partnership and sell the picture back to Orion, and the omission of the AEDP funds on the *pro forma* tax return, were all inconsistent with the expectation of a future receipt of funds and thus should have caused plaintiffs to be on notice of the alleged fraud or wrongdoing. This argument is rejected because plaintiffs have presented a genuine issue of material fact as to both the dissolution proposal and the omission of the film as an asset

on the tax form. First, with respect to dissolution, the general partners sent a letter in November 1988 stating that the dissolution proposal was an attempt to "resolv[e] issues raised by the Internal Revenue Service" by accelerating the repayment of the purchase Notes. (Blumberg Aff. Exh. C). Since litigation with the IRS was pending, this was not an unreasonable explanation. Second, at least three of the plaintiffs conveyed their opposition to the dissolution to the general partners.[10]

Finally, several of the partners stated that they did not receive any correspondence because of address changes. Because a reasonable investor could have concluded that the sale of the movie back to Orion to resolve the tax litigation with the IRS was proper and because some plaintiffs may not have received the correspondence, there is an issue of fact as to whether the 1988 correspondence established the probability of fraud. The same is true of the omission of the AEDP from the *pro forma* tax return.

■ Next, defendants assert that plaintiffs were on inquiry notice of the alleged fraud in 1990 when Orion failed to make the AEDP payment as required on January 10, 1990.[11] This is not a suspicious circumstance that would necessarily alarm a reasonable investor for two reasons: first, because Orion had gone bankrupt and had been taken over by Warner Bros., it was not inconceivable that Warner would balk at paying millions of dollars on its predecessor's deal, and second, the partnership commenced a lawsuit against Orion/Warner in August 1990 to collect the AEDP funds.

■ Finally, defendants assert that the omission of the movie as an asset on the K–1 tax report for 1990 should have alerted plaintiffs to the probability that they were not going to receive any funds under the AEDP. Because litigation was ongoing to recover that amount from Orion/Warner, however, a

---

10. One of them, Dr. Cooper, stated in his affidavit that Glass had told him the AEDP was not mentioned during negotiations to sell the picture because the tax litigation was still pending and could have adverse consequences with respect to the tax shelter aspect of the partnership. Reasonable minds could differ as to whether Cooper should have accepted and relied on this answer.

11. Even if plaintiffs had actual or constructive knowledge of defendants' alleged wrongdoing because of the 1988 correspondence, their claim for breach of fiduciary duty would still stand.

reasonable jury could conclude that it was reasonable for plaintiffs to have believed that the funds should not be listed as an asset until the litigation was resolved. A reasonable jury could also accept plaintiffs' evidence that they were not put on notice of the probability of fraud until certain events in the lawsuit against Orion/Warner (*e.g.,* the Minkoff letter dated November 18, 1992; learning of the Orion attorney's deposition testimony).

Thus, for all of the foregoing reasons, defendants have not met their "extraordinary burden" of proving the absence of any genuine issue of material fact as to whether plaintiffs were on inquiry notice more than two years before the filing of this action.

### CONCLUSION

Accordingly, defendants' motion for summary judgment is denied. The parties are to appear for a status conference in Courtroom 11A of the United States Court House at 500 Pearl Street on October 6, 1995 at 2:15 p.m.

SO ORDERED.