**Kalman WEISS, as Assignee, et al., Plaintiffs,**

**v.**

**LA SUISSE, Societe D'Assurances Sur La Vie, Defendant.**

**No. 97 CIV. 1352 (CM)(MDF).**

United States District Court, S.D. New York.

Sept. 14, 2001.

MEMORANDUM DECISION AND OR-
DER GRANTING PLAINTIFFS'
MOTION FOR SUMMARY JUDG-
MENT OF DEFENDANT'S COUN-
TERCLAIM, DENYING PLAIN-
TIFFS' MOTION FOR CLASS
CERTIFICATION AND LEAVE TO
FILE A SECOND AMENDED
CLASS ACTION COMPLAINT,
AND OVERRULING DEFEN-
DANT'S OBJECTIONS TO MAGIS-
TRATE JUDGE FOX'S DISCOV-
ERY RULING

McMAHON, District Judge.

As explained in detail in my earlier deci-
sions in this case, *Weiss v. La Suisse,* 69

F.Supp.2d 449 (S.D.N.Y.1999) and *Weiss v. La Suisse,* 131 F.Supp.2d 446 (S.D.N.Y. 2001), plaintiffs are members of the Orthodox and/or Chassidic Jewish communities residing in Rockland County and New York City. In 1989 and 1990, plaintiffs purchased a unique type of insurance from defendant La Suisse Life Insurance Company ("La Suisse"). The policies, which designate plaintiffs' children as the insured and the parents as beneficiaries, consist of a term life insurance policy with a "marriage rider." The face amounts of the policies were payable to the beneficiaries in the event that the insured either died or married prior to the end of the contract term, which lasted approximately 15 or 16 years after the purchase date of the policy.[1]

Most insureds were nine or ten years old when these "marriage rider" policies were purchased. La Suisse originally calculated the premiums based on marriage statistics in Switzerland (where as much as 40% of the population never marries and those who marry do so in their mid-twenties) and Israel (where marriage rates and ages are, in general, similar to those in Europe). By contrast, marriage at an early age, 18 or 19, and sometimes younger, is common, in fact almost universal, in certain Orthodox Jewish communities, such as the Chassidim.

Plaintiffs anticipated using the policies as an investment to help pay for wedding expenses. When plaintiffs began to assert claims upon the marriages of their children, La Suisse allegedly stalled, refused to accept proof of marriage from plaintiffs, and avoided payment on the claims. Plaintiffs' amended complaint alleges breach of contract, and discrimination under 42 U.S.C. § 1981.

Defendant counterclaims for fraud, alleging that (1) fraud may be imputed to the plaintiffs through their brokers, who allegedly misled La Suisse officials with respect to the risk and profitability of the policies, and (2) plaintiffs themselves knew that La Suisse was unaware of the policyholders' marriage practices. Plaintiffs move to dismiss the counterclaim (1) as precluded by certain prior Swiss court decisions, and (2) on the grounds that fraud by the brokers cannot be imputed to plaintiffs. In their reply papers, plaintiffs also argue that the counterclaim is time-barred, and move for summary judgment on the substance of defendant's counterclaim. I provided defendant an opportunity to respond to the statute of limitations argument, and defendant did so in a letter brief submitted to the Court on September 7, 2001.

## FACTUAL BACKGROUND

### The Alleged Broker Fraud

Defendant contends that, in 1989, Elias Horowitz, president and sole shareholder of Bituswiss S.A., and Dr. Berysz Rosenberg, Bituswiss' representative in Switzerland, asked a former La Suisse agent to approach La Suisse about marketing life insurance policies with marriage riders. La Suisse agreed, and combined its "Global E" mixed endowment policy with an existing marriage rider product, the "256," to create the "Global E + 256" product. Under the terms of the life-insurance portion of the policy, payment of benefits occurs either upon expiration of the contract term or, before that date, upon the death of the insured. The marriage rider provides for payment of the benefits if the insured marries before the end of the contract term.

---

1. For example, if a policy was purchased when the insured child was ten years old, the contract term would be about 16 years. (Ans. To Am. Compl. at ¶ 177.)

Bituswiss began selling the "Global E + 256" policies in July 1989. It sold the policies exclusively to members of the Orthodox Chassidic communities in New York. In the first three months, Bituswiss obtained more than 700 applications for the Global E + 256. (Muller Decl. at Ex. B.)

Before approaching La Suisse, Horowitz (using the alias Sam Mendelsohn) sold between 400 and 500 similar policies issued by Winterthur, another Swiss insurance company, to members of the Orthodox Chassidic community. (Horowitz Dep. at 52–53, Muller Decl. at Ex. F.) According to defendant, Winterthur calculated its premiums for these policies based on the average marriage age of Swiss persons (26 years for men and 24 years for women) and the percentage of the Swiss population that marries. In March 1989, Winterthur changed the terms and conditions of the policies, setting a minimum age of 20 for the payment of benefits and reducing the face amount of the policies. (Horowitz Dep. at 256, Olson Decl. at Ex. G.) Officials at Winterthur told Horowitz that the company was making the changes because the portfolio was not profitable. (Horowitz Dep. at 248, Olson Decl. at Ex. I.) It was after this change was made that Horowitz approached La Suisse.

La Suisse initially priced its policies using marriage statistics for Switzerland and Israel (Muller Decl. at Ex. G.). Almost immediately, however, La Suisse told Horowitz that it wanted to refine the terms of the policies and adopt a minimum age of 20 on which to pay benefits (similar to the change Winterthur had made in its policies). (Muller Decl. at Ex. I.) Horowitz

advised La Suisse that Bituswiss would not market the policies with these changes. (Muller Decl. at Ex. B at 6.; Id. at Ex. J at 55; Id. at Ex. K at 161–63.) La Suisse contends that Horowitz and Rosenberg argued against the policy changes, despite their knowledge of the "catastrophic" unprofitability of Winterthur's portfolio prior to making such changes. (Rosenberg Dep. at 169–70, Olson Decl. at Ex. O.) Apparently, La Suisse was unaware of the Winterthur situation.

To avoid losing the business, La Suisse did not adopt the minimum age. On August 17, 1989, it offered a compromise solution (proposed by Horowitz): beginning October 1, 1989, La Suisse would deduct from benefits paid to persons who marry before age 20 all unpaid premiums otherwise due until age 20. (Muller Decl. at Ex. L.) But Bituswiss lobbied against *any* changes to the policy as originally written. To this end, the Bituswiss brokers allegedly provided reassurances to La Suisse that the policies were accurately priced. In a meeting between Rosenberg and La Suisse officials on March 28, 1990, Rosenberg claimed (according to company notes) that "the marrying age fluctuated over observation periods of 8–10 years." [2] (Muller Decl. at Ex. C.)

In addition, defendant claims that Bituswiss hid the fact that it was marketing the policies only to a small subset of the general Jewish population (Chassidim) whose marriage profile differed significantly from that of the Jewish population at large. Rather, Bituswiss allegedly made statements that caused defendant to believe that the policies were being marketed more widely.[3] Thus, in a letter brief from

---

2. Although the exact meaning of Rosenberg's statement is unclear, the Court notes that such a statement is not necessarily inaccurate as applied to Bituswiss clients.

3. La Suisse alleges that, in February 1990, it received via facsimile a copy of marriage statistics from the North American Jewish Data Bank, which indicated that the United States Jewish population married on average in the

Rosenberg to La Suisse outlining Bituswiss' grievances with the company, Rosenberg wrote:

> It mustn't be forgotten that more than 3,000,000 Jewish people live in the state of New York; more than in the entire state of Israel. Consequently the potential is huge. . . . Bituswiss S.A. began to expand to other regions in the world in which high concentrations of Jewish people can be found (Great Britain, Canada, other states). But *with the introduction of the new conditions on October 1, 1989 (or more correctly, with its announcement), this was cut off.*

(Muller Decl. at Ex. B at 8.) (emphasis added)

La Suisse alleges that, in reliance on Rosenberg's representations, it withdrew the new terms on March 28, 1990. Instead, defendant adopted an additional premium (referred to by La Suisse officials as a "surprime") for all policyholders living abroad. The surprime was to be refunded if the policyholder did not marry before the age of 20. Under La Suisse's agreement with Bituswiss, the company had to give the brokers three months notice of any policy changes. Thus, the surprime was not to take effect until July 1, 1990. (Muller Decl. at Ex. N.)

Bituswiss sold a large number of policies between March 28, 1990 and the July 1 deadline, after which date sales stopped. (Rosenberg Dep. at 167, Muller Decl. at Ex. Q.) During this time, La Suisse claims that Bituswiss lobbied against the surprime, and to this end, brokers made further misrepresentations about the average marriage ages and rates of those purchasing the policies. The Chairman of the Board of Directors of La Suisse, George Muller, states in his declaration:

> At various meetings, brokers informed La Suisse that the new terms were not justified because they would lead to huge administrative burdens, and the surprime made the premiums so expensive the sales would stop. Finally, the brokers repeatedly assured La Suisse that there was absolutely *no risk of endemic early marriages.*

(Muller Decl. at ¶ 21.) (emphasis in the original)

Muller does not state whether he was at any of the above described meetings, or who at La Suisse heard these statements. Defendant fails to provide affidavits or testimony from anyone to whom any such statements may have been made. The only direct evidence of any representation is a November 8, 1990 memo from Gerhard Mayer, a then-employee of La Suisse, in which Mayer writes that a broker named Moses Aschkenazi informed him that "the average marriage age is 23." (Muller Decl. at Ex. R.) There is no evidence in the record that Aschkenazi is in any way connected to either Bituswiss or the plaintiffs.

No policies were sold between July 1 and the end of 1990. In December 1990, La Suisse (always eager to retain business) rescinded the July 1990 surprime, and introduced a third change in the policies, effective January 1, 2001. Under the 1991 terms, policyholders living outside of Switzerland would be charged a smaller surprime, and the face value of any policy could be reduced if the insured married before age 19. Sales of the marriage rider policies resumed as soon as these changes were implemented, and the 1991 terms governed the marriage rider policies until 1995. La Suisse alleges that Bituswiss

---

mid-twenties. (Muller Decl. at Ex. M.) While La Suisse "believes" the fax was sent to it by one of the brokers, defendant provides no testimony or other evidence about where the fax originated.

continued to conceal the real marriage practices of the Orthodox Chassidic community throughout this period.

During this time, defendant also claims that Horowitz affirmatively misled the company on at least one occasion. During a March 1994, meeting with Blaise Grivel, then an officer at La Suisse, Grivel asked Horowitz when he was married, when his brothers and sisters were married, and about the likelihood of early marriage. In his deposition, Horowitz stated:

I told him that we do marry earlier than the standard, than the general community. He asked me, "Does everyone marry prior to age 20?" and I told him no. In fact, I told him that my brother-in-law was 24 years old at the time, to which he asked me, "Why then do you illustrate [to prospective policyholders] marriage to age 20?" and I told him that people are not concerned—parents are not concerned about marriage after age 20. Children who get older before they get married generally are able to finance their own or at least help to the extent that it becomes less of a problem to the parent. It is the early marriage that concerns most parents, if they marry early before they had a chance to earn anything on their own.

(Horowitz Dep. at 56, Olson Decl. at Ex. P.)

La Suisse claims that, as a result of Bituswiss' and Horowitz's omissions and affirmative misrepresentations, the company did not learn of the true average marriage age of the New York insureds until mid–1995. The "realization" began in March 1995, when the first New York policyholder submitted a claim on behalf of a child who married at age 15. (See Muller Decl. at ¶¶ 26–28; Def. Answer to Am. Compl. and Counterclaim at ¶¶ 241.) Then, in June 1995, La Suisse hired Roland Chlapowski as President of the company. Chlapowski was familiar with the high unprofitability of the marriage insurance policies, although the record does not state from where. He informed La Suisse of the fact that similar marriage-rider policies sold by other insurance companies had proven highly unprofitable. (Muller Dep. at 68.) As a result, La Suisse immediately stopped selling the policies. (See Minutes of La Suisse Board Meeting, attached to Muller Decl. at Ex. T.)

La Suisse followed up on Chlapowski's "bombshell" (Muller Dep. at 153, Horowitz Decl. at Ex. A.) by making inquiries of other insurance companies. On July 24, 1995, Swiss Reinsurance Company responded with copies of information it had provided to other Swiss insurance companies in 1993 and 1994. This information made clear that the marriage statistics for the general Jewish population in North America were not reflective of the customs of the Chassidic policyholders.[4] (Muller Decl. at ¶ 27; Ex. U.)

---

4. Swiss Reinsurance provided to La Suisse copies of two letters, one from 1993 and one from 1994. The 1993 letter stated in part:

During the past three years, various original insurers in Switzerland and in neighboring countries have requested information on this subject *because these companies were contacted by brokers who wanted to sell such marriage insurance policies* and *promised* a very large production potential (especially among Orthodox Jewish groups in New York). This was obviously always the same *group of brokers,* which contacted one company after the other in an effort to place their business.

Jewish groups had already taken out marriage insurance policies on a large scale some years ago. Through companies (in Switzerland and *Belgium* ) with relatively large portfolios of this type it became known that this business involved losses. We wanted to learn the reasons behind these losses to be able to draw conclusions for any possible new product.

Plaintiffs allege that thereafter defendant engaged in the following practices: refusing to pay benefits due; failing to confirm coverage under the policies; failing to acknowledge correspondence from policyholders, beneficiaries, or policy assignees; failing to reinstate cancelled policies in accordance with policy terms and conditions; inducing lapses and breaches under the policy terms; refusing to honor loan requests in accordance with the policy terms, failing to notify plaintiffs of coverage lapses or interest lapses; and failing to acknowledge proof of marriage.

*The Policyholders' Relationship to Bituswiss*

La Suisse contends that Bituswiss, Horowitz, Rosenberg and other brokers acted as the policyholders' agent in inducing La Suisse to issue marriage-rider policies (1) because the policyholders actually designated them as their agent, and (2) because Bituswiss handled all aspects of the transactions and correspondence with La Suisse. For instance, plaintiffs signed forms stating: "I hereby designate 'Bituswiss S.A.' as the sole broker authorized to act on my behalf to apply to La Suisse for insurance on the life of the insured person mentioned above." (Muller Decl. at Ex. V.) Bituswiss employees completed plaintiffs' insurance applications. (Olson Decl. at Ex. R.) On the applications, the policyholders appointed Meliro Treuhand, one of Horowitz and Rosenberg's Swiss corporations, as their Swiss legal representative (an act that defendant fails to point out was required by La Suisse). (Muller Decl. at 31.)

In addition, policyholders gave their premium payments to Horowitz, who converted the money to Swiss francs and paid La Suisse on their behalf. (Horowitz Dep. at 57–58, Olson Decl. at Ex. S.) After the policies were purchased, the policyholders signed forms granting power of attorney to Bituswiss and Horowitz to obtain loans on the policies from La Suisse. (Muller Decl. at Ex. X.) Bituswiss also offered its own loans to policyholders. (Muller Decl. at Ex. Z.) Finally, plaintiffs assigned their policy benefits to Swiss bank accounts held by Horowitz. (Muller Decl. at Ex. AA.)

There is no question that Bituswiss acted as plaintiffs' agent in procuring individual policies for individual plaintiffs, and that they conducted their dealing with La

---

We found out that the portfolio analysis of one company showed that the calculation of the rate should have been based, for instance, on an age at marriage of 18 for girls and 20 for boys.

Enclosed please find a statistic on the age at marriage of Jews, which was published by the North American Jewish Database and which the aforementioned brokers referred to as well.

This statistic provides quite a different picture, since it relates to the entire Jewish population, whereas the purchasers of marriage insurance policies come almost exclusively from strictly Orthodox groups whose social habits are very different and for whom no statistics exist as far as we know. Our research in New York among other places confirmed that marriage at a very early age is the rule in these groups and, furthermore, the marriage partners are very often determined years in advance by the families, which causes massive antiselection and makes the "marriage risk" practically uninsurable.

Based on these facts we recommend to all of our original insurers that they should not offer such coverage, since a marriage insurance policy (i.e., a "mixed" or a "fixed term" policy with early payment upon marriage) if carefully designed is probably no longer very attractive, but would nevertheless hold a risk that cannot be underestimated because any losses would show up only after many years and would then continue for years for a correspondingly large portfolio.

(Muller Decl. at Ex. U.) (emphasis in the original). Why La Suisse did not receive this information earlier cannot be gleaned from the record.

Suisse through Horowitz. However, as the basis of their counterclaim, defendant alleges something different—namely, that Bituswiss was acting as plaintiffs' agent (or perhaps as the agent of the entire Chassidic community) when it pitched the business to La Suisse and induced defendant to go into this line of business in the first place. Defendant conflates the two separate issues of agency—with predictably confusing results, as will be seen below.

*Alleged Fraud By The Policyholders*

Defendant also submits it now has evidence that the policyholders themselves knew "La Suisse was operating from a fundamental misunderstanding about their marriage practices." La Suisse infers this knowledge in part from the policyholders' close relationship with Horowitz, who was a "famous man," a "director in the community," and "really involved in a lot of community things." (Olson Decl. at Ex. D; Ex. E.) Defendant alleges that almost half of the plaintiffs had previously purchased Winterthur policies from Horowitz. (Muller Decl. at ¶ 8.)[5] Because of this, the defendant asks the Court to attribute Horowitz's fraud to the plaintiffs.

La Suisse also argues that the alleged fraud on La Suisse had to be obvious from the advertisements placed by the brokers, which offered large returns on the initial investment, (Muller Decl. at Ex. BB; Olson Decl. at Ex. W; Olson Decl. at Ex. X.) and the profit "illustrations" provided to the policyholders by Bituswiss brokers, which "notably exclude any discussion of profits for marriages occurring after age 20." (Def. Mem. in Opp. to Mot. for Summ. J. at 14.; Muller Decl. at Ex. CC.)

Finally, La Suisse offers testimony from two policyholders concerning their own personal beliefs about the commercial wisdom (or lack of same) of the policies from the standpoint of the issuer. Samuel Weinberger, who was also a Bituswiss "sub-broker," testified in his deposition that "I, myself, was thinking that they [La Suisse] think that marriage took place later." Jacob Fried understood that La Suisse lost money on the policies "because a lot of people get married early," and knew they married younger than the company expected. (Olson Decl. at Ex. Z.) Neither deponent testified that Horowitz or any representative of Bituswiss told them that La Suisse had been affirmatively misled about the marriage age in the Chassidic community.

## CONCLUSIONS OF LAW

Originally, I invited plaintiffs' motion in order to determine whether defendant's counterclaim might be precluded by a November 30, 1998 decision by the Vaud Cantonal Court in Switzerland, and the subsequent affirmation of that decision by the Swiss Federal Court (the high court in Switzerland). (*Ekstein v. La Suisse*, 01 96 0227 (515/97 MED) (Tribunal Cantonal, Canton de Vaud, Nov. 30, 1998) ("Ekstein Decision") attached to Notice of Motion at Ex. C at 2; *Ekstein v. La Suisse*, 5C/19/1999 (Tribunal Federal Suisse, April 7, 1999), attached to Notice of Motion at Ex. D. at 5.) The central question in *Ekstein* was whether, in return for payment of overdue premiums and interest, Ekstein was entitled to reinstatement of his cancelled marriage rider policy. La Suisse asserted the defense of "abuse of the law,"

---

**5.** The supporting documentation for this claim, which ostensibly reveals that 13 of the 30 policyholders in this lawsuit purchased Winterthur policies from Horowitz, is contained in computer records produced by

Horowitz, which are in a repository in White Plains and unavailable to defendant for copying pursuant to the March 16, 2001 order of The Honorable Mark D. Fox, United States Magistrate Judge.

arguing that the Orthodox Satmar community in general, and the plaintiff in particular, failed to act in good faith in obtaining the policies, inasmuch as the members of that community customarily marry young. The Cantonal Court held that failure to notify La Suisse of the true marriage age in the community was not, in and of itself, an abuse of the law.[6]

As it turns out, however, I need not decide the fascinating question of whether the Cantonal Court holding bars the counterclaim under the doctrines of res judicata or collateral estoppel (though I now believe the answer is that it does not[7]). There are two other, more fundamental grounds for dismissal. First, that the counterclaim is time-barred. Second, in the event the counterclaim is timely, dismissal is warranted because there is no evidence that plaintiffs themselves committed fraud, and no evidence that they were involved in or aware of frauds that may have been committed by Bituswiss.

6. The Court examined La Suisse's defense according to the rules and regulations governing good-faith dealing (i.e. Article 2 of the Civil Code), "bearing in mind that the judge shall evaluate any violation of the said rules and regulations in accordance with his own assessment and based on the full set of circumstances, without being bound by rigid rules." (Id. at 18.)

7. I would most likely apply New York law with respect to both recognition of the Swiss court decision and determination of which forum's law of preclusion to apply. See Alfadda v. Fenn, 966 F.Supp. 1317, 1325 (S.D.N.Y.1997); Voreep v. Tarom Romanian Air Transport, No. 96 CIV. 1384, 1999 WL 311811, at *2–*3 (S.D.N.Y. May 18, 1999); Alesayi Beverage Corp. v. Canada Dry Corp., 947 F.Supp. 658, 664 (S.D.N.Y.1996), aff'd, 122 F.3d 1055, 1997 WL 539768 (2d Cir. 1997). Generally, New York courts will give a foreign court decision no more preclusive effect than it would be accorded by the courts of the jurisdiction which rendered it. Voreep, 1999 WL 311811 at *4 citing Watts v. Swiss

1. *Plaintiffs' Motion To Dismiss The Counterclaim On The Grounds That It Is Time–Barred Is Granted*

The appropriate law to determine the timeliness of the counterclaim is that of New York. *Meridien Int'l Bank Ltd. v. Government of the Republic of Liberia,* 23 F.Supp.2d 439, 445–46 (S.D.N.Y.1998) (holding that the Court "must apply state statutes of limitations to the counterclaims based on state law and federal limitations period, where available, for those arising under federal law."); *Legal Aid Society v. City of New York,* 114 F.Supp.2d 204, 218 (S.D.N.Y.2000) (applying New York statute of limitations to pendent state law claim) *citing Baker v. Coughlin,* 77 F.3d 12, 14 (2d Cir.1996).

Where a non-resident's cause of action accrues outside of the state, New York's "borrowing statute" applies. N.Y. C.P.L.R. §§ 202 (McKinney 1990); *Global Financial Corp. v. Triarc Corp.,* 93 N.Y.2d

Bank Corp., 27 N.Y.2d 270, 275, 317 N.Y.S.2d 315, 318, 265 N.E.2d 739 (1970) (finding similar preclusive effect under French and U.S. law) and Schoenbrod v. Siegler, 20 N.Y.2d 403, 409, 283 N.Y.S.2d 881, 230 N.E.2d 638 (1967) (denying preclusive effect to a Mexican divorce decree where the party would have been permitted to collaterally attack the decree in the Mexican courts). Because Switzerland does not recognize the doctrine of collateral estoppel, (Decl. of Isabelle Romy in Opp. to Pls' Mot. for Summ. J. at 3–4.) (citing Isabelle Romy, Litiges de masse, Fribourg 1997, p. 240 et seq. and Max Guldener, Schweizerischee Zivilprozessrecht, Zurich 1979, p. 364.), I would not apply the doctrine to bar any aspect of defendant's counterclaim. Furthermore, although Switzerland recognizes the doctrine of res judicata, or claim preclusion, this doctrine would not bar defendant's counterclaim, as there is no identity of parties on the plaintiffs' side. Parker v. Blauvelt Volunteer Fire Co., Inc., 93 N.Y.2d 343, 347, 690 N.Y.S.2d 478, 712 N.E.2d 647 (1999). See also Romy Decl. at ¶ 3.

525, 526, 693 N.Y.S.2d 479, 479, 715 N.E.2d 482 (1999). Section 202 states:

An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.

*Id.* For purposes of the borrowing statute, a claim accrues in the place of injury. "When an injury is purely economic, the place of injury is usually where the plaintiff resides and sustains the economic impact of the loss." *Global Financial Corp.*, 93 N.Y.2d at 529, 693 N.Y.S.2d 479, 715 N.E.2d 482; *see also Gorlin v. Bond Richman & Co.*, 706 F.Supp. 236, 240 (S.D.N.Y. 1989) ("For purposes of the New York borrowing statute, a cause of action accrues where the injury is sustained. In cases involving economic harm, that place is normally the state of plaintiff's residence.") (citation omitted).

La Suisse is a resident of Switzerland, and its claim accrued in Switzerland. Thus, the claim is untimely if it is barred under the law of *either* New York or Switzerland.

The statute of limitations in New York for fraud is the later of (1) six years from the date of the alleged fraud or (2) two years from the date of defendant discovered or should have discovered the fraud. New York C.P.L.R. 203(g), 213(8) (McKinney 1990 & Supp.1995); *Menke v. Glass,* 898 F.Supp. 227 (S.D.N.Y.1995). When a party could have discovered an alleged fraud is a mixed question of law and fact, *Jeffrey BB v. Cardinal McCloskey School and Home for Children,* 257 A.D.2d 21, 689 N.Y.S.2d 721 (3d Dep't 1999). A court should consider "whether the circumstances of [the] case put plaintiffs on notice of defendant's alleged fraud ... and if, through the exercise of reasonable diligence, they would have discovered the wrongdoing." *Menke,* 898 F.Supp. at 233. *See also Shannon v. Gordon,* 249 A.D.2d 291, 292, 670 N.Y.S.2d 887, 888 (2d Dep't 1998) ("A party may not shut his or her eyes to facts which call for investigation.").

La Suisse did not file its counterclaim until February 2001, more than two years after the date of discovery. However, under New York law, the statute of limitations on all counterclaims is tolled upon filing of the plaintiffs' complaint, which plaintiffs did in February 1997. N.Y. C.P.L.R. § 203(d) (McKinney 1997 Supp.) The alleged fraud took place in 1989 and 1990 (when the products were pitched to La Suisse and sold), well beyond the six year limit.[8] However, there are disputed issues of fact as to whether La Suisse should have discovered the alleged fraud prior to February 1995. *See Menke,* 898 F.Supp. at 233; *McMahan & Co. v. Wherehouse Entertainment, Inc.,* 859 F.Supp. 743, 756 (S.D.N.Y.1994), aff'd. in part, rev'd on other grounds, 65 F.3d 1044 (2d Cir.1995). I therefore cannot grant the motion to dismiss on the basis of the New York statute of limitations.

However, the claim is barred under Swiss law. According to defendant's expert, Swiss law requires that a party give a "declaration of invalidity" essentially, a statement that the allegedly defrauded

---

**8.** While the last alleged misrepresentation was in 1994, by that time the decision to go into this line of business—the decision induced by the alleged fraud—had long ago been made, and the policies had been on the market for four or five years. The 1994 misrepresentation may have delayed the *discovery* of the alleged fraud, but it did not advance the statute of limitations by four years.

party does not consider the contract as binding—within one year of the actual discovery of a fraud.[9] (Wero Opinion at 20, Olson Decl. at Ex. A.) (citing Article 31 I Swiss Code of Obligations). "Actual" discovery:

> implies that the party who wants to invalidate the contract has "clear knowledge of the fraud," i.e. of both of his or her error and of the other party's conduct which cause this error. In general, the knowledge has to be such that the allegation of fraud can be substantiated in court.

(Wero Opinion at 20.) Professor Wero opines that "there are no special requirements for the form of this declaration; in particular, it need not be made in court." (Id.)

The earliest date on which La Suisse could be said to have made such a declaration is February 11, 1997, when defendant wrote to the policyholders' representatives announcing that it considered the policies void or voidable. (Muller Dep. at 150–153, Reply Decl. at Ex. A; Def. Sept. 7, 2001 Letter Brief at Ex. A.) Assuming, *arguendo*, that this letter was sufficient under the Swiss Code of Obligations, the counterclaim is untimely if the fraud was actually discovered prior to February 11, 1996.

■ As to this issue, there is no dispute of fact. Viewing the facts most favorably to the defendant, it appears that La Suisse was on notice of the fraud as of July 1995. (See Answer to Am. Compl. and Counterclaim at ¶ 241; Muller Decl. at ¶¶ 26–29; Def. Mem. of Law in Opp. to Pl's Mot. for Summ. J. at 10.) It was in 1995 that the policyholders began to submit claims, Chlapowski joined the company and dropped his "bombshell," and SwissRe responded to La Suisse's inquiry.

Defendant nevertheless argues that it did not have enough information to conclude that the company had been defrauded under Swiss law until "mid–1996," when George Muller, Chairman of the Board of Directors of La Suisse, traveled to New York.[10] Muller states in a declaration to the Court that it was not until this trip that he "learned for the first time that Bituswiss had marketed the marriage endowment policies to an insular group known as the Chassidic community." (Muller Decl. at ¶ 41.)

This statement is contradicted somewhat by Muller's deposition testimony:

> So first of all, I would like to emphasize that several legal opinions was [sic] given to us, so it was a gradual process, ... the first stage was what we called the bombshell that was dropped on us by Mr. Chlapowski. And to be perfectly honest at the outset we were—we had a lot of doubts. We couldn't believe what he said. So, of course, that led us to verify whether we were completely mistaken. Indeed, that is why I went to New York and little by little, we gathered information. We also consulted other insurance companies and we came to the conclusion that we had been the victim of major fraud. So then, we went into further legal analysis of the situation to know exactly where we stood. Because in Switzerland, at any rate, it's

---

**9.** After expiration of the one-year limitation of Art. 31 of the Swiss Code of Obligations, the defrauded party is precluded from recovery of money paid or goods delivered under the contract. However, there is no such time limitation on a party's right to invoke fraud as a defense against the other party's claim for performance, unless the party entitled to invoke the fraud unequivocally states that it considers itself bound by the contract. (See Wero Opinion at 20–21.) (citing Art. 60 III Swiss Code of Obligations)

**10.** There is no information in the record as to the actual date of Muller's trip to New York.

highly unusual for an insurance company to interrupt or suspend payment. And we knew that doing so, might harm our reputation. So, it's only after we were absolutely certain on the basis of many facts and much evidence and a lot of legal opinions, we took the decision to suspend payment. The decision was a very difficult one to take.

(Muller Dep. at 153–154, Rep. Decl. at Ex. A.) As there is no evidence in the record that defendant consulted with any insurance company other than SwissRe, the Court can only conclude La Suisse received the information to which Muller refers—information which he claims allowed the conclusion that La Suisse had been the victim of major fraud—in July 1995, long before Muller's trip to New York.

■ To the extent the statements in Muller's declaration contradict those in his deposition, they may not be considered. *Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment"); *Raskin v. The Wyatt Company,* 125 F.3d 55, 63 (2d Cir. 1997) ("[W]e follow the rule that a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."). Therefore, Muller's declaration does not raise a disputed issue of fact for purposes of this motion.

Defendant also points to the statement in Professor Wero's opinion that, in 2001, La Suisse discovered new facts that entitled it to lodge a second declaration of invalidity within the one-year time period. (Wero Opinion at 22.) La Suisse contends that these "new facts" relate to the "ex-

traordinarily tight relationship between the brokers and policyholders" from which La Suisse was able to conclude "that the brokers had acted on behalf of the policyholders," thus establishing "another ground for fraud against the policyholders." (See Def. Sept. 7, 2002 Letter–Brief at 3.) Professor Wero provides no support for his contention that Swiss law affords additional opportunities to void a contract upon a later discovery of additional "players" in the same fraudulent scheme. The alleged fraud was inducing La Suisse to issue the marriage rider policies by misleading it about the marriage age in the target population. That fraud (assuming it was a fraud) took place eleven years ago, and was discussed six years ago. Locating additional players does not change the fact that the policy had to be voided no later than five years ago.

As the counterclaim is untimely under Swiss law, it must be dismissed.

2. *Plaintiffs' Motion to Dismiss the Counterclaim On The Grounds That Fraud May Not Be Imputed to Plaintiffs By The Bituswiss Brokers Is Granted*

In the event that the counterclaim is timely, I also address the merits of La Suisse's argument that the plaintiffs may be imputed with the broker's fraud because the brokers are the agents of the policyholders. Because there is not a scintilla of evidence to support this claim, even a timely pleading would have to be dismissed.

La Suisse has not sued Bituswiss or Horowitz, who allegedly made the misrepresentations and nondisclosures that constitute the alleged fraud. Instead, it has countersued the plaintiffs—members of the Chassidic community who purchased the policies through the agency of Bituswiss and Horowitz. Defendant seeks to

impute Bituswiss's frauds (assuming *arguendo* that frauds they were, which I do for purposes of this motion) to Bituswiss's clients. In short, the gravamen of La Suisse's counterclaim is that these unprofitable policies, rather than representing a bad business judgment on the part of La Suisse, were the product of a conspiracy among members of the Chassidic community, who deputized Horowitz to find a way to pay for all these weddings.

▪ Unfortunately for defendant, there is no factual support for any such claim. One cannot simply bootstrap the fact of Bituswiss's agency in connection with the purchase of individual policies (which, if it is not conceded, ought to be) into agency in connection with the negotiations that led La Suisse to issue policies of this sort in the first place. They are two wholly different matters, and they cannot be conflated. If I were in the last stages of an undetectable but fatal disease, and my insurance agent told the insurance company to which I was applying for a policy that I was perfectly healthy I would be held responsible under both the law of Switzerland and the law of New York on the ground that it was made in connection with the insurance application.[11] If, on the other hand, a broker (or group of brokers) convinced an insurance company to market and sell life insurance policies to all of the clients of a large hospice, and these brokers told the company that the hospice was actually a wellness center whose members lived, on average, to age 105, that

fraud could not be attributed to the hospice patients, absent evidence that the hospice patients induced or authorized the misrepresentation.

Defendant offers no evidence to support its claim that the individual plaintiffs, or any other members of the Chassidic communities to which the policies were marketed, deputed Horowitz and Bituswiss as their agents for the purpose of inducing La Suisse to write this type of business, or to offer this particular product. They do not call the court's attention to a single meeting, conversation or writing indicating that the plaintiffs had the slightest awareness of what Horowitz and Bituswiss said to La Suisse. There is simply no evidence that the subject of approaching gullible foreign insurance companies and misleading them so they would write novel insurance products that would prove favorable to the Chassidim was ever broached with plaintiffs. The absence of such evidence is fatal to defendant's counterclaim.

La Suisse also argues that the brokers committed fraud against La Suisse every time it submitted an application on behalf of one of the policyholders. This assumes that the policyholders were committing fraud by allowing those applications to be submitted. Again, such a contention requires evidentiary support to survive the pending motion. Defendant submits that it now has such evidence. It is gossamer.

For example, La Suisse contends that the plaintiffs "must have known" that the

---

11. Under New York law, a broker who procures an insurance policy on behalf of an insured is the agent of the insured, not the insurer. *Soanes v. Empire Blue Cross/Blue Shield,* 970 F.Supp. 230, 243 (S.D.N.Y.1997). The insured is therefore bound by any fraud or misrepresentation by the broker. *Id.; Hayat Carpet Cleaning Co. v. Northern Assurance Co. Ltd. of London,* 69 F.2d 805, 805 (2d Cir.1934). This rule applies to an insured whose broker makes insurance-related mis-representations to the insurer, even if the broker had no authority to make those misrepresentations. *See Amalgamated Mut. Cas. Co. v. Schultz,* 27 Misc.2d 208, 207 N.Y.S.2d, 890, 892 (N.Y.Sup.1960). According to defendant's expert, Swiss law would also hold an insured responsible for broker fraud under Article 101 of the Swiss Code of Obligations. (Wero Opinion at 15.) Plaintiffs offer no contradictory Swiss law.

company was being duped because of the policyholders' close relationship with Horowitz, and the fact (not controverted) that many of the plaintiffs had previously purchased similar policies from Winterthur. Since La Suisse does not proffer a scintilla of evidence tending to establish that any of the individuals knew what Horowitz was saying to La Suisse, it is hard to interpret this argument as anything other than a suggestion that everyone in Horowitz's close-knit community is a crook—a reprehensible proposition.

La Suisse also argues that the fact that it was defrauded had to be obvious from Bituswiss' advertising, which offered large returns on initial investments and illustrated profits by using as examples rates of return on the marriages of 18, 19 and 20 year-olds. With respect, no fraud by Bituswiss, let alone one in which plaintiffs actively participated, can be inferred from the advertisements. Bituswiss emphasized to the members of its limited audience the insurance product's most desirable features. The existence of those features proves nothing about fraud.

La Suisse offers testimony from two plaintiffs who surmised, upon hearing about the policies, that La Suisse must be under a mistaken impression about the age at which Chassidic children generally marry. However, all that proves is that plaintiffs were smarter than defendant. Many things in this world are "too good to be true"; La Suisse's policies fell into that category, especially for members of the Satmar community. The thousands of savvy consumers who signed up for free internet service during the "dot com" boom may well have known that the providers were offering a product that made no business sense, but the fact that these consumers took advantage of the providers' stupidity neither makes them participants in any fraud nor proves their knowledge that

some fraud must have been committed. The same is true of plaintiffs in this case.

If someone had told me in 1990 about the availability of this product, I would have immediately surmised, based on my knowledge about Chassidic practices that I derived from living in New York, that La Suisse must have been ignorant of the community's practice of marrying young. A business school student working on a case study of this product would quickly reach the conclusion that La Suisse had not done adequate due diligence before embarking on this product line. But figuring out that La Suisse behaved carelessly proves nothing about the plaintiffs' involvement in a scheme to induce La Suisse to issue this type of policy.

More or less the same argument was made in the lawsuit brought in the Swiss Cantonal Court. There, as here, La Suisse argued that a policyholder "must have known" about Bituswiss' misrepresentations. The Swiss Cantonal Court emphatically rejected that claim, stating that La Suisse could not claim "abuse of the law" as a defense against the plaintiff, Ekstein (one of the Bituswiss policyholders, although not a plaintiff in this case):

> Although it has been established that Hasidic Jews usually marry young, and that their view of marriage is substantially different from the customary one, it does not seem—contrary to the defendant's contention—that they plan their marriages to such an extent that they lose all sense of randomness, and thus insurability.
> *The fact that the likelihood of the risk's coming to pass before expiration of the insurance is greater among Hasidic Jews than among the rest of the population does not, in and of itself, constitute valid grounds for asserting that Hasidic Jews commit an abuse of the law by obtaining insurance policies of the type*

*obtained by the plaintiff. On the contrary, the proper view to take is that they simply are in a position to profit (granted, with lower risks) from an opportunity that presents itself to them.*

*In point of fact, it is incumbent upon the insurer, in creating the product, to determine the terms and conditions for access to its benefits,* and to provide, in its CGA, for the exclusion of those risks which it does not intend to insure. It is difficult to charge bad faith on the part of the policyholder when the policyholder has properly completed the application form, with no concealment or nondisclosure of information. *In a way, charging abuse of the law in such cases amounts to requiring that an applicant turn himself into an actuary and examine himself in order to determine whether he presents an acceptable insurance risk.*

(Ekstein Decision at 18–19.) (emphasis added)

The holding of the Swiss Court was that a *policyholder is under no obligation* to inform La Suisse, in his application for insurance, that the insured may well marry before the expiration of the contract term. Absent such an obligation, there can be no bad faith, even if the policyholder is aware that he or she is one of many similarly situated people who purchased the policy. (*Ekstein* Decision at 18–19.) (emphasis added) It did not appear to trouble the Cantonal Court that a policyholder might have surmised that La Suisse was in the dark about Orthodox Chassidic marriage rates—the Court's acceptance of this reality is implicit in the holding. I agree 100% with the reasoning of the Cantonal Court.

Plaintiffs' motion for summary judgment dismissing defendant's counterclaim is granted.

### 3. Plaintiffs' Motion for Class Certification And Leave To File A Second Amended Class Action Complaint Is Denied

On June 7, 2001, plaintiffs moved pursuant to Fed R. Civ. P. 15(a) for leave to file a Second Amended Class Action Complaint and pursuant to Fed R. Civ. P. 23(a) and 23(b)(3) for an order certifying and maintaining this action on behalf of "all United States residents who purchased mixed life insurance policies issued by Defendant La Suisse with marriage-event clauses between January 1, 1989 through June 30, 1994 (the 'Class Period') and were damaged thereby." (Second Am. Compl. at ¶ 37.)

Assuming *arguendo* that class certification would be appropriate, I am constrained to deny the motion because of plaintiffs' tardiness in making it.

■ Fed.R.Civ.P. 15(a) provides that leave to amend a complaint shall be "freely given when justice so requires." A motion to amend should be denied only for good reason, such as undue delay, bad faith, futility of amendment and resulting prejudice to the opposing party. *Richardson Greenshields Securities Inc. v. Mui–Hin Lau,* 825 F.2d 647, 653 n. 6 (2d Cir.1987); *State Teachers Retirement Board v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir.1981).

Obviously, this motion comes very late in the day. This action was commenced in 1997. It languished in the White Plains courthouse for more than a year before it was reassigned to me in late 1998. Discovery finally began in June 2000, and thanks to the tremendous efforts of the Honorable Mark D. Fox, United States Magistrate Judge, it is coming to a close. I intend to try the case in January or February of 2002.

■ Plaintiffs' reason for waiting to amend the complaint is that, prior to dis-

covery, they did not have evidence with which to conclude that they could pursue their claims on a class-wide basis. Specifically, plaintiffs state that they learned, during in December 2000 depositions of former La Suisse officials, that La Suisse applied special rules and charges to the marriage policies, and that La Suisse specifically referred to the holders of those policies as "Jewish Orthodox clients" or "Israelites" in corporate documents and board meetings. They claim that these depositions established for the first time that defendant treated the Orthodox Chassidic policyholders as a group, rather than as individuals, and that they "should not be penalized for their prudent desire to await discovery before making claims as serious as those asserted here on a class wide basis." (Pl. Mem. at 22.)

This argument is specious. The proposed class-wide discrimination claim is *identical* to the claim brought by the forty plaintiffs. Both allege that La Suisse discriminated against the policyholders because they were Jews. (Am. Compl. at ¶ 163.) All that plaintiffs now allege is that they have uncovered hard evidence tending to support their original claim. They have not shown me any new claim, or explained why a class-wide claim could not have been brought in the first place.[12] If plaintiffs are taking the position that they didn't know enough to assert a claim of ethnic discrimination against La Suisse until December 2000, then they brought their original complaint without foundation, in violation of Rule 11.

Plaintiffs did not seek to transfer this motion into a class action until the statute of limitations had run on the claims of

many, if not most, of the purchasers who are not already plaintiffs. I will not certify a belated-appearing class on the eve of trial.

Furthermore, I cannot allow the class action to proceed without providing defendant with an opportunity for additional discovery, which I will not do. In particular, there has been no discovery on damages for members of the class. This Court is not prepared either to extend discovery or to bifurcate the upcoming trial in order to accommodate claims that could have been asserted long ago.

For these reasons, plaintiffs' motion for leave to file a second amended class action complaint is denied. Accordingly, I need not rule on the motion for class certification.

4. *The Motion To Sustain Defendant's Objections To Judge Fox's Order Of August 10, 2001 Is Denied*

On August 7 and August 10, 2001, Judge Fox found that La Suisse had waived its objections to the certain of plaintiffs' discovery requests and ordered defendant to produce, *inter alia,* certain privileged and previously redacted documents within two days of his August 10 order. Defendant asked this Court to stay Judge Fox's order pending submission of its objections, and I granted this request. Having reviewed defendant's objections and the transcripts of the proceedings, I find that Judge Fox was entirely correct in his ruling, with which defendants must immediately comply.

■ This Court is to set aside or modify only those portions of a magistrate's order concerning nondispositive matters that are

---

**12.** In a declaration offered in support of defendant's motion to dismiss the original complaint, Horowitz stated, "Needless to say, this litigation will affect thousands of New York residents and not simply the thirty plaintiffs

in the caption. For that reason, many are watching and waiting." (Olson Decl. at Ex. B. at ¶ 17.) If they had claims, they had no business "watching and waiting." They should have acted.

clearly erroneous or contrary to law. Fed. R.Civ.P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A); *Thompson v. Keane*, 95 CIV 2442, 1996 WL 229887, at *1 (S.D.N.Y. May 6, 1996). An order is "clearly erroneous" only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Thompson*, 1996 WL 229887 at *1 (citations omitted); *see also Siao–Pao v. George*, No. 90 CIV 5376, 1992 WL 236184 at *2 (S.D.N.Y. Sept.10, 1992). An order is "contrary to law" when it "fails to apply or misapplies relevant statutes, case law or rules of procedure." *Thompson*, 1996 WL 229887 at *1. A magistrate judge's resolution of discovery disputes deserves substantial deference. *See Siao–Pao*, 1992 WL 236184 at *2; *Thompson*, 1996 WL 229887 at *1. Discovery matters generally are considered "nondispositive" of the litigation. *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir.1990).

On August 7, 2001, Judge Fox heard plaintiffs' contention that La Suisse was not entitled to redact non-party information from documents it had provided in response to plaintiffs' third discovery request. (See Tr. of August 7, 2001 Hrg. attached to Landsman Decl. at Ex. B.) La Suisse responded that Swiss privacy laws prevent the company from providing information about third parties, and that plaintiffs had agreed to the redactions in an August, 23, 2000 stipulation. Judge Fox found that the August 23 stipulation referred only to a particular document request number in plaintiff's first document request of July 31, 2000, and that this stipulation did not carry over to subsequent requests. I have read the record and I agree with Judge Fox that the August 23 stipulation applies only to the first document request.

■ The rules contained in Judge Fox's discovery order are very clear on the steps that La Suisse had to take if it wanted to object to any production request: a party must raise its objection immediately upon receipt of the request, after which the parties have two days to reach an agreement between themselves, otherwise, the objecting party must notify the Court of its objection within four working days. Judge Fox found that La Suisse did not follow these rules. Rather, La Suisse raised its objection in its response to plaintiffs' third discovery request, and notified plaintiffs in a fax that it would provide unredacted documents upon receipt of signed waivers by any third-parties named in the requested documents. Plaintiff did not respond, and defendant provided the redacted documents. (Id. at 12–13.) Judge Fox did not think that La Suisse' actions shifted La Suisse's burden to comply with his orders, and neither do I.

Second, La Suisse objected in its response to production of certain documents on the grounds of attorney-client privilege or attorney work product. During the August 7 hearing, Judge Fox found that these objections were not brought to the Court's attention within the four business days required by Judge Fox's discovery order. He thus deemed waived defendant's third objection to plaintiffs' request no. 46 "except to the extent and only to the extent that they have previously been specifically ruled on by this Court in specific requests and in response to specific requests." (Tr. at 16.) Judge Fox gave the parties until August 9 to provide the Court with any requests or objections which that party believed to be covered by a prior ruling by the Court. He then stated very clearly, that failure to comply would result in waiver.

On August 10, the parties again convened before Judge Fox. Defendant again argued that redaction was covered by the May 23, 2000 stipulation, and Judge Fox again concluded that it was not. Defendant also argued that, pursuant to the stipulation, La Suisse had provided privilege logs which identified the relevant documents. Judge Fox ruled that the privilege logs did not comply with the discovery order, which incorporates Local Civil Rule 26.2. Rule 26.2 provides in part:

(a) Where a claim of privilege is asserted in objecting to any means of discovery or disclosure, including but not limited to a deposition, and an answer is not provided on the basis of such assertion,

(1) The attorney asserting the privilege shall identify the nature of the privilege (including work product) which is being claimed and, if the privilege is governed by state law, indicate the state's privilege rule being invoked; and

(2) The following information shall be provided in the objection, unless divulgence of such information would cause disclosure of the allegedly privileged information:

(A) For documents: (i) the type of document, *e.g.*, letter or memorandum; (ii) the general subject matter of the document; (iii) the date of the document; and (iv) such other information as is sufficient to identify the document for a subpoena duces tecum, including, where appropriate, the author of the document, the addressees of the document, and any other recipients shown in the document, and, where not apparent, the relationship of the author, addressees, and recipients to each other....

Clearly, Judge Fox did not view the logs submitted by La Suisse to be adequate. Far from being clearly erroneous, Judge Fox's ruling was absolutely correct. Nor am I troubled by defendant's objection that Judge Fox deemed La Suisse's objections waived *sua sponte*. Confronted with a host of objections on the eve of the close of discovery, Judge Fox resolved each issue in an entirely evenhanded and fair manner. It is clear from the record that, throughout discovery, both sides consistently delayed raising discovery objections until long past the time required by Judge Fox's rules. These rules are in place to prevent the very nonsense that has occurred here, and Judge Fox acted well within the parameters of his discretion to put a stop to it.

Defendant's objections to Judge Fox's order are overruled, and the stay of Judge Fox's order is dissolved/lifted. Defendant is to comply with Judge Fox's order of August 10, 2001, in full. Any failure to do so will result in the imposition of sanctions.

## CONCLUSION

Plaintiffs' motion for summary judgment dismissing La Suisse's counterclaim is granted. Plaintiffs' motion to file a second amended class action complaint is denied. Defendant's objections to Judge Fox's discovery ruling are overruled.

This lawsuit is really very simple. The only claims that remain for trial are the breach of contract and discrimination claims. On the breach of contract, the question of damages is limited, as plaintiffs have all received their benefits under the policies.

The joint pre-trial order and the parties' motions *in limine* are due November 2, 2001. Responses to *in limine* motions are due Nov. 16, 2001. A trial date will be set by the Court for the first quarter of 2002. There will be no further adjournments.

This constitutes the order and decision of the Court